# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Deyonta D. Green, | Case No. 24-cv-1250 (JRT/DLM) |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| Anoka County, et al, | **JURY TRIAL DEMANDED** |
| Defendants and Third-Party Plaintiffs, | |
| v. | |
| MEnD Correctional Care, PLLC, and Platte River Insurance Company, | |
| Third-Party Defendants. | |

For his Complaint, Plaintiff Deyonta D. Green ("Green") hereby states and alleges as follows:

### Introduction

1.      This is an action for money damages against the Defendants due to their deliberate indifference to Green's serious medical needs while he was incarcerated at the Anoka County Jail (the "Jail") from February 5 to February 12, 2022.

2.      During Green's incarceration at the Jail, he was under the custody and control of Anoka County.

3.      During Green's incarceration at the Jail, Anoka County had a nondelegable constitutional duty to provide adequate medical treatment to those within its custody, including Green.

95537616.1

4.    In 2020, Anoka County contracted with MEnD Correctional Care, PLLC ("MEnD") to provide health care services to inmates incarcerated at the Jail.

5.    Anoka County's contract with MEnD does not immunize the County from liability for damages when the constitutional duty to provide adequate medical treatment is unfulfilled.

6.    The deliberate indifference of the individual Defendants and Anoka County proximately caused Green to deteriorate at the Jail as he suffered through opioid withdrawal.  He became severely dehydrated from persistent vomiting and diarrhea and the inability to keep food or fluids down.  Eventually, due to his ignored and prolonged deterioration from February 5 to February 12, 2022, Green was found unconscious, lying face down in his vomit-covered cell.

7.    The deliberate indifference of the individual Defendants and Anoka County proximately caused Green to sustain multifocal intraparenchymal hemorrhages, subdural and subarachnoid hemorrhages, an occipital epidural hematoma and suffer acute renal failure, hyponatremia, hypochloremia, and pneumomediastinum.

8.    The deliberate indifference of Anoka County was multifaceted.  It stemmed from: a) entering into the contract with MEnD despite the County's knowledge that it was a deliberately indifferent medical "provider"; b) continuing to contract with MEnD despite glaring and persisting deficiencies, including among other things "insufficient staffing" at the Jail; and c) customs, patterns and practices of permitting Jail correctional officers (COs) to ignore individuals suffering from known and severe opioid withdrawal – a serious medical need.

95537616.1

9.    The Defendants named in their individual capacities, through their actions and inactions, were deliberately indifferent to Green's serious medical needs as he deteriorated during his incarceration at the Jail.

10.    The actions and inactions of the Defendants named in their individual capacities are emblematic of the customs, patterns and practices of the County and its policymakers.

11.    The deliberate indifference of the County to inmates' serious medical needs started prior to Green's incarceration, spanned the entirety of Green's incarceration at the Jail, and occurred at all levels.

12.    The deliberate indifference of the individual medical Defendants – Skroch, Jensrud and Calvario – was apparent through their interactions with Green from February 7 to February 9, and then, on February 10 to February 12, by way of their inactions.

13.    The actions and inactions of the individual correctional Defendants – Biah, Fields, Vang, Kramer, Kong, Parks and Stafford – are most galling from February 9 to February 12.

14.    Green brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action.

15.    As this action arises purely under federal law, state-law claims, and by consequence the limitations and defenses under state law, are not applicable to this civil-rights lawsuit.

3

95537616.1

16.     Venue is proper in this Court under 28 U.S.C. § 1391, as a substantial part of the events giving rise to this action occurred in this District.

## The Parties

17.     Green is, and was at all times material herein, a citizen of the United States and a resident of Champlin, Minnesota.  He was 25 years old at the time of the events giving rise to this action.

18.     Green suffered from opioid substance abuse prior to his incarceration at the Jail.

19.     Defendant Anoka County is a "public corporation," suable under Minn. Stat. § 373.01, subd. 1(a)(1).  Anoka County is, and at all times material hereto was, a political entity charged with control and supervision of the Jail, located in Anoka, Minnesota, and ensuring that constitutionally appropriate medical care was provided to all Jail inmates.

20.     Defendants Sewah Biah, Noushelong Vang, Jordan Fields, Matthew Kramer, Meng Kong and Justin Parks were at all times material herein citizens of the United States, residents of the State of Minnesota, and acting under color of state law as correctional officers at the Jail.  They are sued in their individual capacities.

21.     Defendants Biah, Vang, Fields, Kramer, Kong and Parks were assigned to a Housing Deputy "post" (i.e., daily job assignment) for Green's housing unit during his incarceration:

95537616.1

- Biah was a Housing Deputy for Green's housing unit on February 9 and February 10.

- Vang was a Housing Deputy for Green's housing unit on February 9 and February 10.

- Fields was a Housing Deputy for Green's housing unit on February 10.

- Kramer was a Housing Deputy for Green's housing unit on February 11.

- Kong was a Housing Deputy for Green's housing unit on February 11.

- Parks was a Housing Deputy for Green's housing unit on February 8, February 11 and 12.

22.     As a Housing Deputy, Defendants Biah, Vang, Fields, Kramer, Kong and Parks interacted with Green on a number of occasions, including but not limited to: headcounts, meal passes, wristband scans, transfers to medical, "well-being checks," cell shakedowns, and by virtue of being stationed *in Green's unit* where they were each tasked with his direct supervision and spent time in close proximity to Green as he deteriorated.

23.     Defendant Eric Stafford was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a Sergeant at the Jail.  Stafford is sued in his individual capacity.

24.     Stafford worked at the Jail on February 6 through February 12, while Green was in custody.

95537616.1

25.     Stafford was the Duty Supervisor for the C Shift spanning from February 11 to February 12, 2022.

26.     As the Duty Supervisor, Stafford interacted with Green while making rounds in Green's unit and conducting "well-being checks" that, in reality, did nothing to assess Green's well-being.

27.     Defendant Michelle Skroch was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a medical employee working at the Jail.  Skroch is sued in her individual capacity as a Registered Nurse (RN) employed to provide constitutionally required medical services at the Jail.

28.     Defendant Monica Calvario was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a medical employee working at the Jail.  Calvario is sued in her individual capacity as an RN employed to provide constitutionally required medical services at the Jail.

29.     Defendant Holly Jensrud was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a medical employee working at the Jail.  Jensrud is sued in her individual capacity as an RN and a Certified Nurse Practitioner (CNP) employed to provide constitutionally required medical services at the Jail.

30.     Calvario and Skroch both saw Green during his incarceration at the Jail.

31.     Jensrud was working as the "Medical Provider" at the Jail during Green's incarceration in February 2022, approving actions or inactions of Calvario and Skroch.

95537616.1

95537616.1

**Anoka County Policymakers**

32.     James Stuart was at all times material herein the Anoka County Sheriff.  As Sheriff, one of his primary duties was managing the Jail.

33.     Stuart was a policymaker for the County.

34.     Dave Pacholl was the Jail Commander at the time Anoka County contracted with MEnD and through his retirement.

35.     Sheila Larson was a Lieutenant at the Jail at the time the County contracted with MEnD.

36.     Larson was promoted to Jail Commander after Pacholl's retirement.

37.     Larson remained the Commander of the Jail at the time of Green's incarceration at the Jail in February 2022.

38.     Commanders of the Jail are tasked with the creation and implementation of policies, practices, and procedures for personnel working inside of the Jail.

**February 12, 2022:  Multifaceted Deliberate Indifference Comes to a Head, Causing Green's Withdrawal to Reach Life-Threatening Stage**

39.     Green was arrested by a Coon Rapids police officer on February 5, 2022, at 10:12 pm and was transported to the Jail, where he was booked by CO Corbin Sycks.

40.     Green remained in the care, custody and control of the Jail from then through the morning of February 12, 2022, when he was transported by ambulance to Mercy Hospital.

41.     During his incarceration, Green had a valid prescription for Suboxone from Dr. Lisa Vollmer due to his opioid addiction.

8

42.    The Suboxone medication was in the care, custody and control of the County – it sat in a locked box at the Anoka County Workhouse, where Green had originally been placed in late January 2022 due to his underlying drug charges.

43.    During Green's incarceration at the Jail, his mother made several attempts to ensure her son received his Suboxone by calling the Jail, Workhouse and Green's probation officer, as well as offering to transport the medication from the Workhouse to the Jail.

44.    Green *never* received his Suboxone at the Jail.

45.    Jail reports indicate that around 4:30 am on February 12, Defendant Parks was alerted to Green's cell due to "a noise" and he found Green in an "awkward position" lying on his stomach on the floor of his cell, with his head partially under the bottom bunk.

46.    Upon information and belief, that noise was Green falling and injuring himself in his cell as a result of his dire medical state, due to his severe opioid withdrawal that he had been suffering from, without relief, during nearly his entire incarceration at the Jail.

47.    Green's cell neighbor described hearing a noise in the early morning hours of February 12 – a bang, "like he fell."

48.    The previous day, Green had fainted while waiting in line for meal pass that was being conducted by Defendant Kramer.

49.    Video of that fall shows Green beginning to sway and then falling backward to the ground without catching himself.

50.     The video is unclear as to exactly what portions of Green's body hit the ground but he was unable to catch himself and fell straight backwards.

51.     Kramer chose to do nothing to obtain medical care or otherwise assist Green after he fell from fainting.

52.     Green continued to medically deteriorate thereafter.

53.     After hearing the noise from Green's cell on February 12, Defendant Parks completed his checks on the remaining cells in Unit 6 and alerted COs Pace and Pederson, as well as Defendant Stafford, about Green.

54.     Green had been having uncontrollable diarrhea observed and noted by Defendant Biah on February 9, 2022.

55.     Green had been having uncontrollable bouts of vomiting known to COs at the Jail since *at least* February 9, 2022, if not before.

56.     Green had reported the same, as well as other painful and severe opioid withdrawal symptoms, to medical personnel at the Jail: Skroch and Calvario on February 7 and 8.

57.     Skroch and Calvario reported these to Jensrud, but none of the individual medical Defendants did anything to actually treat Green's withdrawal symptoms.

58.     Green had also exhibited obvious signs and symptoms of withdrawal in his housing unit – Level 4, Unit 6 – during his incarceration at the Jail.

59.     But, each of the individual CO Defendants chose to do nothing to obtain medical care or otherwise assist Green.

10

60.     Green's vomiting and other withdrawal signs and symptoms continued into the early morning hours of February 12, 2022.

61.     Further, Green either did not accept or gave away *all* of his meals on February 10 and February 11, under the watch of Defendants Fields, Vang, Kramer and Kong.

62.     Green's persistent, known withdrawal symptoms and the known fact that he had not eaten for two dates another fall not only foreseeable, but an inevitability.

63.     The following are descriptions of Green's cell from those who responded on February 12:

- The smell of vomit was immediately noticeable upon entering the cell;

- Vomit surrounded Green where he laid on the floor of his cell; and

- Vomit was "all over the floor of his cell[.]"

64.     More troubling were the descriptions of Green himself.

65.     Green had vomit on his body, his face was covered in thick yellow vomit, and drool was dripping from his chin.

66.     Green appeared unconscious.  He did not respond coherently to verbal or other stimuli.

67.     Green's eyes were slightly open, but they were not focusing, and his pupils were dilated.

68.     Green could only groan and grimace.  He could not otherwise communicate and was incoherent.

95537616.1

69.     Green was unable to control his body and required the help of responding Jail staff to sit in a recovery position.

70.     Reportedly, Parks and others assisted Green to his bunk and "maintained him there as [they] feared he would fall and hurt himself" a *third* time at the Jail.

71.     Green's vitals could not be obtained because he had lost the ability to control his body movements and no one could simultaneously maintain Green in a recovery position and obtain his vitals.

72.     No medical personnel were at the Jail overnight and into the early morning hours of February 12, 2022.

73.     The contract for medical services between MEnD and the County required 24/7/365 medical staffing for the safety of the inmates.

74.     But, MEnD and the County operated in breach of that requirement for the entirety of the contract.

75.     Green continued mumbling, groaning, and grimacing, but otherwise remained unresponsive to the responding Defendants and COs.

76.     The responding Defendants and COs correctly suspected withdrawal as one of the obvious reasons for Green's condition.

77.     Allina Health Emergency Medical Services (EMS) was dispatched to the Jail at 4:51 am for "Emergent (Immediate Response)" and arrived at 5:09 am.

78.     Reportedly, Green was found by EMS "sitting on his bed in his jail cell." He was "alerted but his mental status was altered and was not able to follow commands and strange behavior was noted."

12

95537616.1

79.    Defendant Parks informed EMS personnel that he was completing his rounds and noted Green "was laying prone on the ground with vomit around his face, on his shirt and on the ground around his cell."

80.    Defendant Parks' exhibited no urgency in responding to Green's cell upon finding him on the ground and Jail staff's nonchalance and disgust captured by the video evidence that was preserved.

81.    Green was also unable to answer questions from EMS personnel or follow commands.

82.    EMS noted Green had a Glasgow Coma Scale score of 10, or moderate.

83.    Green's EKG showed he was tachycardic.

84.    Incredibly, Green was made to *walk* from his cell and down the stairs.

85.    The video evidence of this "walk" is horrifying:



86.     Only after that trek down the stairs was Green put on a stretcher.

87.     Green was transported Code 3 to the Mercy Hospital emergency department (ED).  He arrived at 5:31 am and was taken directly into a critical care room due to the severity of his condition.

88.     His pulse was 116, his respirations were 24, he was delirious, groaning, muttering unintelligibly, and unable to answer questions or follow commands and had clonus (muscular spasms).

95537616.1

89.     Green's labs were "diffusely abnormal with acute renal failure, lactate >20, hyponatremia, hypochloremia."

90.     Green's EKG noted QTc of 540.

91.     QTc is prolonged in men if it is over 440.

92.     QTc over 500 is a risk factor for developing a fatal cardiac arrhythmia.

93.     Green was given 30 ml/kg normal saline, ketamine, Benadryl, Ativan, and Haldol and taken for CT scans of his head, chest/abdomen/pelvis and spine.

94.      CT scans for the various portions of Green's body were required because he was found face-down in vomit, was delirious, and had suspected traumatic injuries, including but not limited to a traumatic head injury.

95.     The results of Green's CT scans were as follows:

   a) CT of chest, abdomen, pelvis: pneumomediastinum, slight left lower lobe ground glass opacity[1]

   b) CT of head:

      i.   Lentiform extra-axial hemorrhage along the left occipital lobe measuring 1 cm in thickness. Given morphology and that the hemorrhage is adjacent to the calvarial fracture, appearance is concerning for epidural hemorrhage with hyperacute blood products or active hemorrhage;

      ii.  Subdural hemorrhage along the right cerebellum, anterior falx, the posterior clivus, and likely along the bilateral inferior temporal lobes and middle cranial fossa;

      iii. Multifocal hemorrhagic parenchymal contusions, the largest of which is located in the lateral aspect of the right temporal lobe;

---

[1] The CT of the cervical spine referred providers to the chest CT for further evaluation of the pneumomediastinum.

95537616.1

    iv.  Trace subarachnoid hemorrhage along the inferior frontal lobes; and

    v.  Trace pneumocephalus along the right temporal lobe is suspicious for an occult right temporal bone fracture extending through the mastoid air cells, however, there is no mastoid or middle ear effusion.

96.    The "Critical Result" from the head CT was noted as "multi compartmental intracranial hemorrhage and calvarial fractures" – skull fractures and a brain bleed.

97.    Green's mental status worsened in the ED, and he had gurgling respirations requiring intubation.

98.    Green's ethanol serum or plasma collected at 5:45 am at Mercy Hospital registered **no** alcohol in his system.

99.    A neurosurgery consult recommended transferring Green to a Level 1 Trauma Center, and Hennepin County Medical Center (HCMC) agreed to accept him.

100.    Green was on propofol.  Further, Keppra was started for seizure prophylaxis.

101.    Green was transported "lights-and-sirens" to HCMC.

102.    Green remained intubated during this transport.

103.    Green was sedated during the transport.

104.    A subsequent search of Green's Jail cell noted no signs or remnants of intoxicating substances, only a trash bin full of vomit.

105.    Green did not consume illegal drugs or alcohol while at the Jail.

106.    Green did not consume illegal drugs or alcohol on February 12, 2022, including during his ambulance transport to HCMC, when he was intubated and unconscious.

107.    Green was admitted to HCMC on February 12, 2022.

108.    Diagrams of his body noted Green presented with abrasions on his forehead, non-blanchable redness on his left buttock and clavicle, healing scabs on his chest and redness on the back of his head and both feet.

109.    The HCMC notes indicate that Green fell and sustained significant trauma, including a "classic coup-contrecoup injury."

110.    Green's prognosis was guarded.



111.    On February 12, 2022, Green underwent a right frontal external ventricular drain (EVD) placement due to suffering a traumatic brain injury.  Green's head was

17

shaved, the site was prepped, and surgeons incised the skin down to the cranium. A drill was used to trephinate the cranium. Excess bone was removed, and the drain was placed perpendicular to Green's skull. Anterior to the EVD, a twist-drill was used to create a burr hole for a bolt that was used to secure a Licox holder.

112.    Green remained intubated and mechanically ventilated at HCMC through February 15, 2022, when he was extubated.

113.    During his time at HCMC, Green underwent a variety of treatments, including, but not limited to, occupational therapy due to impairments with motor function and conditions that created safety concerns and limited his abilities to perform activities of daily living; physical therapy; and speech-language communication therapy.

114.    Green was monitored by the ICU team, surgery, nephrology and neurosurgery while at HCMC.

115.    On February 24, 2022, Green underwent a craniotomy – left occipital hematoma evacuation. A craniotomy is a procedure by which a hole is drilled in the skull in order to reveal part of the brain. During the procedure, Green's skin was incised, and two burr holes were created and connected in an oval fashion to form about a five-centimeter opening. A firm dark blood clot was immediately visible, which was evacuated. Once that was evacuated, no additional bleeding was found.

116.    Green was discharged from HCMC on March 6, 2022, after three weeks of intensive treatment.

117.    While he remained at HCMC, Green was furloughed from Anoka County's custody on February 16, 2022, by judicial Order, thereby allowing the County to avoid

95537616.1

paying for the necessary, life-saving, and expensive medical care Green required due to the County's own deliberate indifference.

118.    Furlough is the typical course for counties – as a cost-saving measure – when prolonged hospitalization is anticipated.

119.    Within later communication requesting a downward modification of Green's sentence, Assistant Anoka County Attorney Paul Ostrow acknowledged Green suffered a life-threatening incident at the Jail due to withdrawal.

120.    Since his discharge, Green has required follow-up care due to his traumatic brain injury and continued cognitive issues therefrom.

121.    As a result of the life-threatening situation Green was left in due to the Defendants' deliberate indifference, Green's head remains scarred from the treatment required for his head injuries.

122.    Green continues to experience nerve pain over the scarred area.

123.    Green continues to experience headaches.

124.    Green continues to suffer from memory loss.

125.    Green has been referred to neuropsychology due to his continued TBI issues.

126.    All of this was because Green was allowed to medically deteriorate, without intervention, over the course of his seven days at the Jail.

127.    Green deteriorated to the point where he was found lying on his vomit-covered cell floor, with vomit all over his body, drool dripping from his chin, a severe

19

head injury and in renal failure due to rampant deliberate indifference within the Jail – which is described in the following sections of this Complaint.

## Dangers of and Treatment for Opioid Use Disorder

128.    According to the United States Substance Abuse and Mental Health Service Administration, "[t]he misuse of prescription opioids and the use of heroin is one of the most significant public health issues in the [Country]."[2]

129.    Opioids are a class of drug that includes legal prescriptions, i.e., oxycodone, hydrocodone, codeine, and morphine; synthetic opioids, i.e. fentanyl; and the illegal drug heroin.

130.    Heroin was one of the drugs Green admitted to using on the day he was brought to the Jail.

131.    A number of times at the Jail, Green informed both jail and medical staff that he was a long-term heroine user and/or of his recent use prior to his arrival to the Jail.

132.    A 2019 national survey found that "over 1.6 million people in the United States have an opioid use disorder" (OUD).[3]

133.    A chart from the National Institute on Drug Abuse shows the rise in overdose deaths attributable to opioids from 1999 to 2021:

---

[2] *Opioids*, Substance Abuse and Mental Health Services Administration, https://www.samhsa.gov/data/taxonomy/term/442.

[3] *Use of Medication-Assisted Treatment in Emergency Departments*, Substance Abuse and Mental Health Services Administration, https://store.samhsa.gov/sites/default/files/pep21-pl-guide-5.pdf.



Figure 3. National Overdose Deaths Involving Any Opioid*, Number Among All Ages, by Gender, 1999-2021

*Among deaths with drug overdose as the underlying cause, the "any opioid" subcategory was determined by the following ICD-10 multiple cause-of-death codes: natural and semi-synthetic opioids (T40.2), methadone (T40.3), other synthetic opioids (other than methadone) (T40.4), or heroin (T40.1). Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 1999-2021 on CDC WONDER Online Database, released 1/2023.

134.    Anoka County was not immune from the opioid-abuse epidemic, as noted in a 2019 article from one of the County's local news sources, Hometownsource.com.[4]

135.    In addition to overdose deaths, opioid withdrawal itself can lead to death.

136.    Opioid withdrawal symptoms can include, but are not limited to: nausea, vomiting, diarrhea, tremors and disturbed sleep.

137.    Opioid withdrawal can be a painful process, causing joint, bone, and muscle pain; abdominal pain; and headaches.

138.    Withdrawal is likely to occur in individuals who: a) have been taking high doses of opioids; b) have been taking opioids for more than six months; or c) reduce doses of opioids too quickly.

---

[4] Paige Kieffer, *Seeking Sobriety: Treating opioid addiction in Anoka County*, ABC Newspapers, April 29, 2019, https://www.hometownsource.com/abc_newspapers/free/seeking-sobriety-treating-opioid-addiction-in-anoka-county/article_9b450ecc-62dd-11e9-8e8f-8fc2dfda96e4.html.

95537616.1

139.    Medication-assisted treatment is a common, safe, and effective way to treat opioid addiction.[5]  Through medication-assisted treatment, individuals are prescribed medication that helps normalize brain chemistry, block the euphoric effects of opioids, and relieve physical cravings.[6]

140.    The United States Food and Drug Administration (FDA) approved medication-assisted treatment for opioid dependence well before Green's incarceration at the Jail.

141.    In fact, the FDA had approved *three* medications for treating opioid addiction: naltrexone, methadone, and buprenorphine.[7]

142.    Buprenorphine is a partial agonist.  "[I]t tightly binds but only partially activates the receptor, and produc[es] a ceiling effect in experienced opioid users, at which point increasing the dose does not increase the effects on respiratory or cardiovascular function."[8]

143.    "For those with a tolerance to opioids as a result of OUD, buprenorphine is often a safe choice."[9]

---

[5] *Information about Medication-Assisted Treatment (MAT)*, U.S. Food and Drug Administration, https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat.
[6] *Medication-Assisted Treatment FAQ*, Illinois Department of Public Health, https://dph.illinois.gov/topics-services/opioids/treatment/mat-faq.html.
[7] *Id.*
[8] *Use of Medication-Assisted Treatment in Emergency Departments*, Substance Abuse and Mental Health Services Administration, https://store.samhsa.gov/sites/default/files/pep21-pl-guide-5.pdf.
[9] *Id.*

95537616.1

144.    The World Health Organization has classified buprenorphine as an "essential" medicine.[10]

145.    A brand name for buprenorphine is Suboxone.

146.    Green's Suboxone medication sat at the Workhouse approximately 1 mile away from the Jail during his entire incarceration.

### Anoka County's Knowledge Regarding the Opioid Epidemic

147.    As of at least 2017, the Anoka County Sheriff's Office and Jail Division knew about the prevalence and dangers of opioids.  Evidence of the County's knowledge comes from publications by policymakers, programs implemented at the Jail, the County's 2020 solicitation of proposals for contracted medical care at the Jail, and the County's participation in state-wide studies relating to Minnesota's response to the opioid epidemic.

148.    Through the same, Anoka County knew about the importance of medicated assisted treatment of opioid use disorder *and* continuity of such care.

149.    Unfortunately, the opioid epidemic has continued.[11]

---

[10] *Opioid agonist pharmacotherapy used for the treatment of opioid dependence (maintenance)*, World Health Organization, https://www.who.int/data/gho/indicator-metadata-registry/imr-details/2718#:~:text=Methadone%20and%20buprenorphine%20have%20a,maintenance%20treatment%20of%20opioid%20dependence.

[11] Paige Kieffer, *Seeking Sobriety: Treating opioid addiction in Anoka County*, ABC Newspapers, April 29, 2019, https://www.hometownsource.com/abc_newspapers/free/seeking-sobriety-treating-opioid-addiction-in-anoka-county/article_9b450ecc-62dd-11e9-8e8f-8fc2dfda96e4.html.

95537616.1

150.    And, without the opioid or one of the approved medication-assisted treatment methods, users go into withdrawal.[12]

151.    But, the Anoka County Sheriff's Office and Jail Division knew treatment for opioid addition was available.  In other words, they knew the dangers of opioid withdrawal are preventable.[13]

152.    In fact, "[b]uprenorphine [was] easier to access in Anoka County because it [could] be prescribed not only by a physician, but also through a nurse or physician's assistant."[14]

153.    The Minnesota legislature passed the Opiate Epidemic Response bill in 2019.  The bill raised funds from drug manufacturers to fight the opioid crisis and created a state-wide Opioid Epidemic Response Advisory Council.

154.    As part of the Council's work, Anoka County participated in a June 2021 survey by the Minnesota Department of Management and Budget relating to the use of "Medications of opioid Use Disorder" by county jails and community-corrections entities.  Through its participation in this survey, Anoka County provided information about use of medication-assisted treatment in the Jail to the Department of Management and Budget.[15]

---

[12] *Id.*

[13] David Chanen, *Anoka County piloting innovative treatment of jail inmates on heroin,* StarTribune, Feb. 23, 2017, https://www.startribune.com/anoka-county-piloting-innovative-treatment-of-jail-inmates-on-heroin/414670433/ (until the Fresh Start program, the Jail had "few options" to ease withdrawal symptoms).

[14] *Id.*

[15] Williamson, Ian, & Merrick, Weston. (2021). *Treating Opioid Use Disorder for Criminal-Justice-Involved Individuals.* Minnesota Management and Budget. Retrieved from

155.    Anoka County's participation in this study further highlights its knowledge of the importance in addressing effects of the opioid epidemic.

156.    Through Minnesota's Opioid Epidemic Response, the Department of Management and Budget was tasked with evaluating "programs related to education, prevention, treatment, and services for individuals and families affected by opioid use disorder."[16]

157.    Anoka County participated in one of the studies initiated through Minn. Stat. § 256.042 (establishing Minnesota's Opiate Epidemic Response Advisory Council), which found, in pertinent part, that:

- "Individuals in the criminal justice system have been hit particularly hard by the opioid epidemic."

- "[D]rug overdose is now a leading cause of death among formerly incarcerated individuals."

- "There are…highly effective medications available to treat individuals with [opioid use disorder]."

- Combining medicated-assisted treatment with "counseling and behavioral therapies, [is] proven to reduce substance use disorder."

---

https://mn.gov/mmb/assets/Treating%20Opioid%20Use%20Disorder%20for%20Criminal-Justice-Involved%20Individuals_tcm1059-511580.pdf

[16] *Early Opioid Policy Response*, Minnesota Management and Budget, https://mn.gov/mmb/impact-evaluation/projects/opioid-epidemic-response/.

95537616.1

- "Prescribing [medications of opioid use disorder] for incarcerated populations results in higher rates of continuing treatment in the community and lower rates of relapse after release." [17]

158. Further, the Jail's Custody Manual in effect at the time of Green's incarceration warned Jail staff that "[s]ignificant percentages of inmates have a history of alcohol and/or drug abuse."

159. The Custody Manual warned that "[w]ithdrawal from alcohol or drugs can be a life-threatening medical condition."

160. The Custody Manual both warned and required the following:

**To lessen the risk of a life-threatening medical emergency and to promote the safety and security of all persons in the facility, staff shall respond promptly to medical symptoms presented by inmates.**

161. Personnel at the Jail, including medical and correctional staff, received training relating to recognizing the signs and symptoms of illness and knowledge of the action required in potential emergency situations prior to Green's incarceration at the Jail.

162. Personnel at the Jail, including medical and correctional staff, received training relating to recognition of the signs and symptoms of chemical dependency prior to Green's incarceration at the Jail.

---

[17] Williamson, Ian, & Merrick, Weston. (2021). *Treating Opioid Use Disorder for Criminal-Justice-Involved Individuals.* Minnesota Management and Budget. Retrieved from https://mn.gov/mmb/assets/Treating%20Opioid%20Use%20Disorder%20for%20Criminal-Justice-Involved%20Individuals_tcm1059-511580.pdf

26

95537616.1

163.    Personnel at the Jail, including medical and correctional staff, received training relating to opioid addiction and withdrawal symptoms prior to Green's incarceration at the Jail.

164.    Personnel at the Jail, including medical and correctional staff, were to remain alert to inmates exhibiting signs of overdose and withdrawal.

165.    Those signs or symptoms include, but are not limited to, sweating, nausea, vomiting, abdominal cramps, anxiety, agitation, tremors, hallucinations, rapid breathing, aches and pains, and diarrhea.

166.    Any staff member at the Jail who suspected an inmate was experiencing withdrawal symptoms was required to notify a supervisor.

167.    Upon notification of an inmate experiencing withdrawal symptoms, the supervisor was required to ensure the appropriate medical staff were notified.

168.    The reason *symptoms* of withdrawal require prompt medical attention is because they can lead to serious injury or death.

### COs' Means to Observe Inmates at the Jail

169.    COs, including Defendants Biah, Vang, Fields, Kramer, Kong, and Parks, as well as Sergeant Stafford, had several opportunities to observe and interact with inmates, during well-being checks, meal pass, headcounts, and simply spending time within the housing units, among other types of interactions.

170.    Well-being checks are conducted to make sure inmates are alive and well.

171.    The County has historically had issues with conducting and logging well-being checks.

95537616.1

172. These issues were confirmed by data from the Minnesota Department of Corrections (DOC) and the evidence available from Green's incarceration at the Jail in 2022.

173. The DOC is a regulating agency for correctional facilities throughout the State of Minnesota.

174. Chapter 2911 of the Minnesota Administrative Rules provides the minimum standards for correctional facilities in the state.

175. As part of its oversight, the DOC performs inspections of correctional facilities, including the Anoka County Jail, to evaluate facilities' conformance with rules outlined in Chapter 2911.

176. Under Chapter 2911, there are 50 delineated rules, some with specific subparts identified, that Minnesota correctional facilities must comply with. A facility must be in 100% compliance with those 50 rules (or subparts within) in order to meet approval for continued operation. Chapter 2911.0300, subp. 1.

177. Included this list, in pertinent part, is Chapter 2911.5000, subp. 5 regarding well-being checks on inmates. *See* Chapter 2911.0300, subp. 5(a)(32).

178. Chapter 2911.5000, subp. 5 requires correctional facilities to "have a system for providing for well-being checks of inmates."

179. The Jail must have "[a] written policy and procedure" providing "that all inmates are personally observed by a custody staff person at least once every 30 minutes."

180.    "If a well-being check does not occur due to an emergency, it must be documented in the jail log and have supervisory review and approval."  Chapter 2911.5000, subp. 5.

181.    Chapter 2911.5000, subp. 5 requires more frequent observation of an inmate with a special need classification.  "Examples of inmates of a special need classification include…those experiencing withdrawal from drugs or alcohol."

182.    Because the purpose of well-being checks is to determine that an inmate is alive and well or, conversely, in need of medical or other intervention for the inmate's safety, well-being checks are a vital job of COs in correctional facilities.

183.    Well-being checks are the way that the COs – the boots on the ground at jails – know what is going on so they can address issues; pass on information to sergeants, medical or the oncoming shift; and ensure the safety and security of individuals at the facility.

184.    It is imperative to know *who* conducted the check, *when* the check was completed, *how long* the CO spent with the inmate, and in *what* condition the CO observed the inmate.   As such, accurate documentation of the well-being checks is necessary.

185.    Absent logging of well-being checks in the above-described manner, one must review surveillance video to know what happened and to evaluate whether a well-being check was done properly or done at all.

95537616.1

186.    If surveillance video is not available *and* the well-being checks have not been logged in the above-described manner, there is no way to verify that the checks were performed, or properly performed.

187.    From at least 2016 through 2022, the Jail *never* complied with the mandatory rules delineated in Chapter 2911.0300, subp. 5(a).

188.    The compliance issues led to the Jail being placed on "conditional approval" in 2016, 2017, 2019 and 2021 – meaning there were corrective actions that needed to be completed by the Jail.

189.    The Jail's low compliance ratings also led to more frequent – annual versus the statutorily required biannual – DOC inspections from at least 2016 to 2019, and again from 2021 to 2022.

190.    At times, including in 2017, 2018 and 2022 – the year Green was incarcerated at the Jail – DOC inspectors noted issues with well-being checks at the Jail. The DOC found the "checks" by the COs were performed at *too fast* a pace to check for signs of life or determine the well-being of inmates.

191.    Those types of well-being checks "were essentially nullities, and amounted to no check at all." *Lynas v. Stang*, No. 18-CV-2301, 2020 WL 4816375, at *8 (D. Minn. Aug. 19, 2020).

192.    Another function of the DOC inspectors is to review unusual occurrences.

193.    Under Chapter 2911.3700, subp. 4, there are several unusual occurrences that require mandatory reporting by jail personnel to the DOC, including in pertinent part,

30

"serious injury or illness subsequent to detention including incidents resulting in hospitalization for medical care."

194.    Similar issues with well-being checks were also noted within the review of unusual occurrences that took place at the Jail.

195.    A number of the unusual occurrences that occurred at the Jail during the County's contract with MEnD involved inmates in situations similar to Green (i.e., found unresponsive in their cell).

196.    Importantly, in many instances, well-being-check issues at the Jail were uncovered by DOC inspectors upon review of video evidence.

197.    The need for review of video evidence is unsurprising given the virtually non-existent record keeping of well-being checks at the Anoka County Jail.

198.    The compliance issues uncovered by the DOC's inspections and its review of unusual occurrences evidence customs, patterns or practices of: 1) COs that could not be bothered to perform well-being checks; 2) COs performing well-being checks in such a perfunctory manner as to amount to no checks at all; and/or 3) COs performing well-being checks and choosing to do nothing to help inmates with observed or observable serious medical needs.

199.    The County persistently failed to correct these known issues at the Jail, as well as documentation issues – all of which relate to tasks that affect safety and security of persons at the Jail.

200.    The list of persistently unfixed issues goes on and only grew after the County's deliberately indifferent decision to contract with MEnD.

31

201.    While the Jail's 2022 inspection noted well-being check issues, it did note that the Jail had a "well-defined auditing process in place."  In reality, that only meant using the Guardian RFID logging system – when, if used *and* reviewed (i.e., audited) properly, *could* help ensure proper well-being checks were being performed.  But that was *not* the case at the Jail.

### Anoka County's "Well-Defined" Auditing Process:  Guardian RFID and DOC oversight

202.    The Jail went "live" with Guardian RFID in September 2019.

203.    Prior to the implementation of Guardian RFID, COs documented well-being checks manually into the Jail Management System.

204.    The manual method of tracking meant important details were omitted, leaving weak reports about which COs did what; when; how the checks were performed; and what was observed of the inmates.[18]

205.    With the upgrade to Guardian RFID, COs at the Jail had the ability to capture a wide range of inmate activities, behavioral observations, program attendance and court transports, and easily log and upload the information to the Guardian RFID Cloud.

206.    In materials provided to the Jail, Guardian RFID claimed the system:

- Permitted COs to "log virtually every task[;]"
- Helped COs "share and receive information…important to safety and security[;]" and

---

[18] https://guardianrfid.com/press-releases/2019/09/19/anoka-county-sheriffs-office-goes-live-with-guardian-rfid

95537616.1

- "[H]istorically track[ed] every movement, every observation and every documented interaction or service [COs] provide[d] inmates" and, therefore maximized "legal defensibility."

207.   For example, during well-being checks, COs could use the Guardian system to log "exact observations, behaviors, moods, interactions, etc. of the inmates."

208.   Per the Guardian RFID materials provided to the Jail, noting several observations or behaviors of inmates on the system provided "a more comprehensive picture of the observation, therefore staff should be encouraged to record any behaviors they observe, **including and perhaps most importantly any signs of life.**" (emphasis added).

209.   As such, the materials provided to the Jail warned: "[w]hen logging observations be sure to note **any 'signs of life'** that are seen **during each cell check**." (emphasis added).

210.   However, that is *not* what was done historically at the Jail, or – as the records show – during Green's incarceration in 2022.

211.   A review of both Green's well-being check log and the available video indicated the following customs, patterns and practices persisted: 1) COs not bothering to perform well-being checks; 2) COs performing well-being checks in such a perfunctory manner as to amount to no check at all; and/or 3) COs performing well-being checks and choosing to do nothing to help inmates with observed or observable serious medical needs.

212.    Unsurprisingly, there was a lack of logging of observations of inmate behavior.

213.    This negatively impacted the pass-on of key information regarding inmate health and safety.

214.    Above and beyond the required well-being checks, personnel at the Jail were expected to embed themselves in the units they were assigned to.

215.    Per Jail training, COs with sufficient credentials would work as "Housing Deputies."

216.    A Housing Deputy was assigned to a housing unit.

217.    Housing Deputies – including Defendants Biah, Vang, Fields, Kramer, Kong and Parks – supervised inmates in that unit under the philosophy of "direct supervision," meaning they were *in the unit* and supposed to be *continually observing the inmates*.

218.    A Housing Deputy was to supervise all unit activities.

219.    A Housing Deputy was to pay close attention to details in the unit.

220.    A Housing Deputy was to move about the housing unit.

221.    All of these functions allowed Housing Deputies to further familiarize themselves with the inmates in their unit.

222.    The Housing Deputies were to know the inmates' names, patterns, and needs, along with any risks inmates posed to themselves or others in the Jail.

223.    Through the extensive interactions, Housing Deputies were to gather more information and *use* that information to identify and resolve problems.

34

224.    Upon information and belief, given the number of serious medical incidents reported by the Jail to the DOC, this is not what was done historically.

225.    Instead, the amount and frequency of reported unusual occurrences evince a custom, pattern or practice of COs failing to properly address observed or observable serious medical needs exhibited by inmates within their units – i.e., a failure to *use* information obtained from direct supervision.

226.    True to form, this "direct supervision" model was not utilized in any such manner by Defendants Biah, Vang, Fields, Kramer, Kong and Parks – who, instead, ignored what was there to be seen, heard and, likely, smelled.

227.    Upon information and belief, Sergeants – who also spent time in the Units – were also trained on the "direct supervision" philosophy.

228.    True to form, this "direct supervision" model was not utilized in any such manner by Defendant Stafford – who also ignored what was there to be seen, heard and, likely, smelled.

229.    It was against this backdrop of cascading layers of deliberate indifference – well-being checks that would not assess an inmate's well-being, insufficient record keeping, failure to abide by the Jail's own policies, and the failure to correct longstanding deficiencies documented over time by the DOC – that the County started its dangerous search for an outside medical provider for its inmates.

### Anoka County's Search for a Cheaper Alternative for Medical Care

230.    Prior to 2020, Anoka County provided healthcare services to inmates at the Jail in-house, by using public healthcare providers.

231.    In 2020, Anoka County made the decision to switch to a private, for-profit contractor for healthcare at its Jail.[19]  In April 2020, the Anoka County Sheriff's Office and Anoka County Community Corrections Department issued a joint Request for Proposal (RFP) for providing correctional healthcare services at the Jail, soliciting proposals from various private entities.[20]  It was also interested in contracting with a company that could help the Jail transition to electronic management of records (EMR).

232.    Anoka County – through its approved policymakers – further demonstrated its knowledge regarding the effects of OUD on incarcerated persons and the importance of providing appropriate treatment to them in its 2020 RFP.  The treatment of opioid addiction and withdrawal were critical components explicitly mentioned in the RFP.

233.    The Scope of Services required for the Jail under the County's RFP included the management and treatment of intoxicated individuals and individuals going through withdrawals, as well as the management of inmates coming into the Jail on medicated-assisted treatment for OUD.

234.    Further, the County's Scope of Services for the Jail under the RFP required the contractor to communicate with Jail staff about the treatment and daily care of inmates, as well as information regarding inmates on chemical withdrawal and medication-assisted treatment.

---

[19] A.J. Lagoe, Brandon Stahl, Steve Eckert, *KARE 11 Investigates: Jail medical contract awarded based on misleading information*, Feb. 18, 2021 (updated Oct. 29, 2021), https://www.kare11.com/article/news/investigations/kare-11-investigates-anoka-county-jail-mend-correctional-care-contract/89-fbec7088-8534-4b7f-b100-b129084d861e.
[20] August, 25, 2020 Anoka Board of Commissioners County Board Agenda, https://www.anokacountymn.gov/AgendaCenter/ViewFile/Agenda/_08252020-1683.

95537616.1

235.    The RFP contemplated services for both intoxicated persons and individuals suffering from withdrawal because the County knew Jail personnel would frequently encounter both of those conditions.

236.    Further, the RFP contemplated frequent communication regarding individuals being monitored for withdrawal *and* those engaged in medication-assisted treatment for OUD, because the County understood such information was imperative for Jail personnel (medical and correctional) to both provide constitutionally required care and refrain from deliberate indifference.

### Anoka County Contracts with MEnD – the Deliberately Indifferent Provider

237.    MEnD was at all times material herein a for-profit limited liability company organized under the laws of the State of Minnesota with its principal place of business in Sartell, Minnesota.

238.    MEnD submitted a proposal in May 2020 to provide healthcare services for the Jail in response to Anoka County's RFP.

239.    Out of the various proposals it received, Anoka County decided to contract with MEnD.

240.    Anoka County contracted with MEnD in the fall of 2020 for a maximum contract value of $7,237,033 for an initial term of October 1, 2020 to December 3, 2023, during which MEnD was to provide health care services at the Jail.

241.    Through its contract with MEnD, Anoka County deferred to MEnD on medical decisions, policies, and treatment for its inmates.  In the contract, Anoka County

deferred policymaking to MEnD because it supposedly had "superior information and expertise with respect to medical policies and procedures."

242.    At the time Anoka County contracted with MEnD, Dr. Todd Leonard was MEnD's sole owner.

243.    MEnD's website boasted that it had saved counties "millions of dollars."

244.    As evidenced by its Proposal for Healthcare Services to Anoka County, the business model of MEnD was to save money by having lesser-qualified "providers" – physician assistants, family nurse practitioners, registered nurses, and health techs – work as the boots on the ground in place of physicians at the jails where it contracted to provide services.

245.    The three lesser-qualified individuals working as medical staff at the Jail through the Anoka County/MEnD contract most pertinent to Green's incarceration were Defendants Jensrud, Skroch, and Calvario.

246.    Apparently, this met the County's staffing requirements for the Jail.

247.    Anoka County's RFP defined "Responsible Medical Provider" as

An individual licensed to practice medicine and provide health services to the inmate population of the facility or the physician at an institution with final responsibility for decisions related to medical judgments. **This may be a licensed nurse practitioner, physician assistant, or physician with a master's level degree or higher who is authorized to write prescriptions.**

(emphasis added).

248.    At the August 25, 2020 Anoka County Commissioners' meeting where the Commissioners approved the contract with MEnD, Cindy Cesare, the County's Human Services Division Manager, confirmed that with MEnD, the County would have an "MD

38

– a medical *director*."  Notable at the meeting was Ms. Cesare's clarification that "MD" within the context of the MEnD contract did **not** mean "Medical Doctor."  By approving MEnD's contract proposal at this meeting, Anoka County Commissioners knew the Jail would not be staffed with a physician despite the Jail housing *hundreds* of inmates from high-risk populations *and* the County's constitutional duty to provide adequate medical treatment to inmates.

249.    All of this was despite then-County Attorney Anthony Palumbo's warning to the Commissioners at this meeting that the bulk of "very meaningful litigation" against the County came from the failure to provide constitutionally required medical services at the Jail and his reminder that the largest liability claim the County had ever paid was to an inmate for over $3 million.

250.    Mr. Palumbo had good reason to provide this warning, given the disclosures MEnD provided at Anoka County's request.

251.    As noted within MEnD's May 2020 response to Anoka County's request for "litigation and claims history for the past ten years[,]" MEnD had been sued many times:

95537616.1

| Date of Claim/lawsuit | Claimant | Nature of Claim/lawsuit | Dollar amount requested as damages | Disposition of Claim/lawsuit | Resolution | Date of Resolution |
|---|---|---|---|---|---|---|
| 9/14/17 | Trinidad Garcia | Civil Rights | | Closed | Dismissed | 12/7/18 |
| 9/15/17 | Rudolph | Civil Rights | | Closed | Settled | 8/12/19 |
| 11/6/17 | Goldmann | Civil Rights | | Closed | Dismissed | 9/25/18 |
| 4/11/18 | Brenner | Civil Rights | | Open | N/A | N/A |
| 8/7/18 | Lynas | Civil Rights | | Open | N/A | N/A |
| 11/1/18 | Heiderscheid | Civil Rights | | Closed | Dismissed | 9/18/19 |
| 11/8/18 | Perry (Sherrell) | Civil Rights | | Open | N/A | N/A |
| 2016 | Giersdorf | Civil Rights | | Closed | Dismissed | 2016 |
| 2016 | Wilson | Civil Rights | | Closed | Dismissed | 2016 |
| 2017 | Moore | Civil Rights | | Closed | Dismissed | 2017 |
| 6/6/19 | Jackson | Civil Rights | | Closed | Dismissed | 7/29/19 |

252.   This list was both woefully incomplete and inaccurate.

253.   The lack of full and accurate information in this answer really renders it a non-answer good enough to mollify the uncaring.

254.   The most critical information needed to analyze MEnD's history is missing from the 11 listed cases.  MEnD provided a mere label and *no* information about the basis for liability or the type and amount of damages asserted against it.  Nevertheless, the sheer number of *disclosed* cases within a short period served as a red flag, particularly given Mr. Palumbo's warnings.

255.   Making matters worse, MEnD's disclosure was incomplete:  it left off at least **five** additional federal lawsuits that were filed against MEnD within the applicable 10-year period.  Those included:

- Baxter-Knutson, No. 14-CV-03796 (filed in 2014);

- Hanks, No. 14-CV-01349 (filed in 2015);

- Taylor, No. 16-CV-03573 (filed in 2016);

- Thompson, No. 19-CV-01559 (filed in 2019); and

- Andrews, No. 20-CV-01674 (filed in 2020).

256. Though MEnD itself provided sparse details, a number of its settlement payments were widely reported by local media and publicly available to anyone who cared to look, including:

- Baxter-Knutson ($1.45 million global settlement, with MEnD paying more than half );[21]

- Lynas ($2.3 million global settlement, with MEnD paying $1 million);[22] and

- Perry ($2.6 million global settlement, with MEnD paying $2.1 million).[23]

257. The large settlement amounts were additional red flags to the County.

258. Also important are the *facts* of the cases brought against MEnD.

259. At least four of the lawsuits disclosed by MEnD involved deaths of inmates: Rudolph, Brenner, Lynas and Perry (Sherrell).

260. Ms. Rudolph, like Green, was a heroin user.

---

[21] A.J. Lagoe, Brandon Stahl, Steve Eckert, *KARE 11 Investigates: 'Unethical' record of Minnesota's largest jail health care provider*, Dec. 10, 2020 (updated Oct. 29, 2021), https://www.kare11.com/article/news/investigations/kare-11-investigates-unethical-record-of-minnesotas-largest-jail-health-care-provider/89-aed51ef6-ca37-4ace-b6d0-3e079389c9e9.

[22] A.J. Lagoe, Brandon Stahl, Steve Eckert, *KARE 11 Investigates: Jail death results in $2.3 million payout*, Feb. 3, 2021 (updated Oct. 29, 2021), https://www.kare11.com/article/news/investigations/kare-11-investigates-jail-death-results-in-23-million-payout/89-bb7e639c-f669-4e7b-b44d-4255f7051dbd.

[23] Jenny Berg, *Beltrami County, medical provider agree to pay $2.6 in jail inmate's death*, StarTribune, March 10, 2023, https://www.startribune.com/beltrami-county-mend-correctional-care-settlement-inmate-death-hardel-sherrell-del-shea-perry/600257820/.

95537616.1

261.    According to the Amended Complaint filed on April 16, 2018 by the Trustee for Ms. Rudolph's heirs and next-of-kin, while she was at the Clay County Jail in 2016 – where MEnD was the contracted medical provider – Ms. Rudolph began going through opioid withdrawals.

262.    As a result of her withdrawals, Ms. Rudolph vomited and otherwise uncontrollably expelled so much of her bodily fluids that she lost 17 pounds – nearly 13% of her body weight – in only four days at the jail.

263.    Ms. Rudolph was never given any medication or intravenous fluids to address her persistent vomiting and diarrhea, and she died as a result of these opioid withdrawal symptoms and the absence of any treatment.

264.    The similarities between Green's situation, described in detail below, and Ms. Rudolph's are staggering.

265.    Another inmate-death lawsuit involving MEnD concerned James Lynas. He, too, was withdrawing from drugs during his incarceration.

266.    Mr. Lynas's pain during his withdrawal was so severe that he expressed suicidal ideations.

267.    True to form, MEnD only provided Mr. Lynas hydroxyzine – a pharmacological band-aid for his serious medical needs.[24]

---

[24] *See Lynas v. Stang*, No. 18-CV-2301, 2020 WL 4816375, at *8 (D. Minn. Aug. 19, 2020).

42

268.    The medications made available to Green and Lynas are similar in that they were entirely inadequate – providing no meaningful treatment for these inmates' serious medical needs and suffering.

269.    MEnD had a policy, practice, and custom of undertreating and mistreating inmates withdrawing from opioids, with dangerous, documented consequences.

270.    The facts regarding MEnD's deliberate indifference to both Lynas and Rudolph were publicly available, and in fact well-publicized, before Anoka County entered into the contract with MEnD.

271.    From MEnD's litigation disclosures alone, Anoka County had actual knowledge that MEnD was failing to provide adequate medical treatment to inmates within the jails with which it had contracted.

272.    Possibly even more disturbing are the facts about Leonard that were publicly available – and well-publicized – from the Minnesota Board of Medical Practice Licensing and a number of news reports.

273.    Prior to contracting with Anoka County, Leonard exhibited unethical and unprofessional conduct, as noted publicly by the Minnesota Board of Medical Practice.

274.    As a result of the Board's findings, Leonard was reprimanded and fined by the Minnesota Board of Medical Practice and then practiced medicine under a restricted license.

275.    During the Board's review process, Leonard stipulated to a number of facts, including, but not limited to, that he failed to document risks of suicide, failed to document addictions, and exhibited inappropriate prescribing practices.

276. Leonard's problems and misconducted continued despite his reprimand and license restriction.

277. In a scathing 2020 article (updated in 2021), news outlet KARE11 published additional findings related to civil lawsuits alleging Leonard's falsification of records and unconstitutional medical care.[25]

278. The KARE11 article reported that while the amount of money MEnD took in from taxpayers had *increased* over the years, **so had the death toll** due to MEnD's deliberate indifference.[26]

279. KARE11 went on to publish a series of articles about deliberate indifference leading to deaths of inmates in Minnesota jails.  MEnD was featured within the KARE11 series entitled "Cruel and Unusual."

280. KARE11's investigation noted the number of deaths under MEnD from 2015 to 2021 had reached **25**.[27]

281. Further, in July 2020, before Anoka County contracted with MEnD, Minnesota Attorney General Keith Ellison asked the federal government to investigate

---

[25]A.J. Lagoe, Brandon Stahl, Steve Eckert, *KARE 11 Investigates: 'Unethical' record of Minnesota's largest jail health care provider*, Dec. 10, 2020 (updated Oct. 29, 2021), https://www.kare11.com/article/news/investigations/kare-11-investigates-unethical-record-of-minnesotas-largest-jail-health-care-provider/89-aed51ef6-ca37-4ace-b6d0-3e079389c9e9.
[26] *Id.*
[27] *Id.*

the widely reported death of Hardel Sherrell ("Perry" in MEnD's litigation disclosure above).[28]

282.    The FBI's investigation into Sherrell's death included Leonard.

283.    To recap, prior to the fall of 2020, MEnD had paid out *millions* of dollars as a result of a number of lawsuits alleging deliberate indifference to inmates' serious medical needs.

284.    Further, prior to the fall of 2020, Leonard had been publicly disciplined by the Board of Medicine.

285.    Additionally, as of at least May 6, 2020, Skroch knew she was under investigation by the Minnesota Board of Nursing relating to the death of Hardell Sherrell. The investigation would eventually lead to the revocation of Skroch's nursing license.

286.    Leonard was also the subject of many news stories and investigative reports – including KARE11's "Cruel and Unusual," a finalist for the Peabody Award in 2021 – regarding his questionable practices and deficient care.

287.    Despite all of this, Anoka County claimed it "engaged in due diligence in the evaluation and negotiation of [the] contract" before selecting MEnD as the Jail's medical provider.[29]

---

[28] *See* July 10, 2020 Letter from The Office of Minnesota Attorney General Keith Ellison, https://s3.documentcloud.org/documents/7009766/Letter-to-US-Attorney-MacDonald-Re-in-the-Matter.pdf; *see also*, A.J. Lagoe, Brnadon Stahl, Steve Eckert, *KARE 11 Investigates: 50 deaths in MN jails to be investigated by state,* July 29, 2020 (updated Oc. 29, 2021). https://www.kare11.com/article/news/investigations/doc-investigation-50-jail-deaths/89-5dfe51d8-41be-480c-8268-3243dee00e99.
[29] A.J. Lagoe, Brnadon Stahl, Steve Eckert, *KARE 11 Investigates: Jail medical contract awarded based on misleading information,* Feb. 18, 2021 (updated Oct. 29, 2021),

288.     Any such due diligence by Anoka County would have uncovered some or all of the damning information about MEnD and Leonard.

289.     Yet notwithstanding all of the red flags regarding MEnD's past deliberate indifference, the County entered into the contract anyway.

290.     MEnD started operating at the Jail on October 1, 2020.

### Anoka County's Knowledge of MEnD Issues at the Jail

291.      A mere two months after MEnD started its work under the contract, several troubling issues with MEnD had already been uncovered by Jail personnel.

292.     Meeting notes from a December 2, 2020 meeting between Jail personnel and MEnD memorialized some of the issues, including: 1) a lack of follow-up by medical staff when they were contacted regarding medical or mental-health concerns; 2) a lack of follow-up by medical staff about whether or not an inmate was seen; 3) a lack of follow-up by medical staff about any concerns; and 4) a lack of follow-up by medical staff for explanations regarding the medical or mental health issues.  The stated issues were causing confusion for Jail COs.

293.     Just days later, an inmate was found face down in a pool of blood.  This inmate had previously asked for Suboxone, complained of being "dope sick" and engaged in suicidal behavior due to the severity of his withdrawals.

294.     A chart entitled "MEnD Contract Compliance Concerns – 12/7/2020" outlined a number of other issues relating to MEnD's work at the Jail, including: 1) the

---

https://www.kare11.com/article/news/investigations/kare-11-investigates-anoka-county-jail-mend-correctional-care-contract/89-fbec7088-8534-4b7f-b100-b129084d861e.

jail still lacked an overnight nurse; 2) MEnD was not covering nurses who called in sick; 3) the nurse practitioner rounds had not been determined so it was unclear if they met contract standards; 4) MEnD had not confirmed if it maintained medication counts in all facilities, including the Jail; 5) MEnD was billing for work that had not yet completed; 6) MEnD had failed to provide a monthly report of facility expenditures; and 7) MEnD had no plan for testing all Jail inmates for COVID-19.

295.    The issues threatened inmate safety.

296.    On December 16, 2020, a meeting was held to address the December 7, 2020 chart. Leonard, Skroch, Larson, and Dylan Warkentin (from Anoka County Community Corrections) met and they "read through the memo together going point by point through each of the concern areas."

297.    A post-meeting memorandum noted the topics of discussion included: delays in mental-health screenings; delays in release of medical screenings and medication – due to lack of overnight shift staffing; "trivial" hospital referrals; communication issues; monthly meetings; Fusion EMR implementation; and cost pool records for the Jail.

298.    On December 18, 2020, AJ Lagoe of KARE11 emailed Anoka County personnel regarding MEnD's untrue responses to the County's RFP.

299.    Specifically, Lagoe noted that MEnD failed to disclose the Baxter-Jensen lawsuit in Stearns County; failed to disclose complaints filed in 2018 with the State Board of Medicine, Nursing Board, and Department of Corrections with regard to an inmate in Beltrami County; and misrepresented that it follows NCCHC jail standards.

47

300.     On January 4, 2021, Leonard emailed Larson about fixing the "omissions" but continued to omit key information he was supposed to include about MEnD's litigation history.

301.     On January 6, 2021, Leonard emailed Pacholl, Larson, and others, falsely claiming he used all of the space provided on the litigation history sheet.

302.     Upon information and belief, no one from the County required Leonard to complete the missing information.

303.     Within the same email, Leonard alerted Pacholl and Larson about additional litigation, including the *Bunker* matter.  Leonard falsely claimed *Bunker* would be dismissed.

304.     *Bunker* involved another death attributable to MEnD.

305.     *Bunker* settled in mid-2021 for $2.25 million.

306.     Leonard also acknowledged that MEnD was "still trying to finalize implementation of certain service items" – items required by the contract that were still not being provided.

307.     Later in January 2020, Leonard informed undisclosed recipients with the County about Drs. Kurt DeVine and Heather Bell and MEnD Recovery Services.  Within the emails, Leonard touted the impact the doctors will have on the Medication Assisted Treatment of OUD.

308.     Neither Drs. DeVine nor Bell saw, treated or were consulted about Green.

309.     It is unclear whether Drs. DeVine or Bell ever set foot in the Jail.

310.    On February 9, 2021, Larson emailed Stafford and Pacholl, among others, for a "Medical Meeting Follow-Up."  Therein, it was acknowledged that there was still no overnight nursing at the Jail.  Further, the communication issues between COs and medical continued.

311.    The continued issues threatened inmate safety.

312.    On March 11, 2021, an inmate was reportedly unresponsive and barely breathing, requiring transportation to the hospital.

313.    On March 19, 2021, over a month after the last meeting, Jail Operations Lieutenant Dave Tredow emailed Pacholl and Larson about "[f]urther Mend issues." Therein, he discussed MEnD's "continued 'short staffing' problems" and the resultant impact on the Jail.

314.    Again, on March 19, 2021, Tredow emailed Pacholl and Larson noting that Andrea Kretsch of MEnD was "trying to cover their short-comings" by "temporarily shift[ing] some of her staff from the [Workhouse] to help cover [the Jail]."  Tredow recommended okaying this, "[g]iven the circumstances."

315.    Such shifting was *not* to be permitted under the County's Request for Proposal and amounted to a breach of its contract with MEnD.  Instead, all County facilities – including the Jail – were to be independently fully staffed.

316.    On April 14, 2021, nearly a month after Tredow's emails about the continued problems with MEnD, Leonard responded to an email regarding continued staffing issues.  Leonard's response to Pacholl provided a list of ways he intended to fix the issues, and it was forwarded to Defendant Larson.

49

317.    From later communication, it is apparent the "proposed" fixes were not implemented.

318.    The County knew this and yet it only engaged in similar letter-writing campaigns that failed to force Leonard/MEnD into performing as required under the contract.

319.    As a result, the issues that endangered the safety and well-being of inmates continued.

320.    Also on April 14, 2021, Pacholl was informed that Kretsch, who operated in a managerial role at the Jail, had resigned effective May 11.  The email to Pacholl noted the impact of losing someone in a managerial role, stating it "could create some coverage issues for all facilities and a local leadership void."  Pacholl's response indicated he was aware of the issues.

321.    Pacholl requested a call with Leonard on the same day.

322.    A memorandum entitled "4/14/2021 – MEnD Phone Call" outlined continuing concerns regarding MEnD's work at the Jail, including but not limited to: 1) staffing levels; 2) lack of 24/7 staffing – *never* having overnight staffing agreed upon in the contract; 3) staffing turnover resulting in lower medical hours agreed upon in the contract; 4) loss of supervisory staff; 5) loss of clerical support; and 6) imminent loss of the Anoka nursing director "most likely due to having to cover so many open shifts and gaps."

323.    In sum, the County concluded at least by April 2021 – **ten** months before Green came to the Jail – that it "was not receiving the negotiated services." Rather than

50

drop MEnD at th point, the County merely accepted a reduction on the next month's bill to "account for the staffing [issues]."

324.    On April 24, 2021, another Jail inmate was found unresponsive and was transported to the hospital.

325.    These medical emergencies with similarities to Green's spurred communication with MEnD regarding the failure to provide the required services under the contract with the County. But, no steps to force compliance or enforce the contract were taken beyond lip service and the implementation of discounts to the County.

326.    On or around April 27, 2021 Pacholl and Larson learned of issues with MEnD's false promises about the implementation of an electronic medical records system, which was another required provision of the County's contract with MEnD. They also again discussed the staffing issues.

327.    On April 28, 2021, Pacholl sent Leonard an email entitled "Jail Medical Services, Staffing and Fusion EMR." In the email Pacholl reiterated the following important issues:

1. Jail Medical Services – As we discussed a week or so ago, I am concerned that we are not receiving the full services for which we are being billed. You mentioned the possibility of adjusting future billing or providing some form of credit. Would you please update me on your plan to address this issue.
2. Staffing – I know you are working to fill positions at our jail. However, with the on-going turnover we are not sure of your present staffing / staffing levels. Would you please have someone from your office send me an up-to-date list of your current employees assigned to the jail as well as current openings.
3. Fusion EMR – I'm not sure how, but our IT somehow got involved in the Fusion EMR project. I don't think they need to be involved since your company committed to getting Fusion EMR on-board and function per the RFP. Would you please give me

**AC003266**

an update on when we should expect Fusion EMR to be live at our facility.

328.    Leonard responded, briefly, on May 1, 2021 noting the "team is shaping up quickly!"  Leonard claimed he would get in touch with a spreadsheet on Monday.

329.    The MEnD invoice on May 1, 2021 documented the contemplated $31,200 rebate for shift vacancies up to April 2021, as well as a $14,500 discount for shift vacancies in April 2021.

330.    Upon information and belief, Leonard failed to get in touch with Pacholl on Monday, May 3, 2021.

331.    On Tuesday, May 4, 2021, Pacholl again reached out to Leonard for a phone call about "billing credits, staffing roster/status and a tentative staffing timeline."

95537616.1

332.     After Pacholl and Leonard touched base, Leonard created a document that "encapsulated" the HR team and nursing leadership team for the Jail and emailed it to Pacholl on May 8, 2021.  The document acknowledged the following deficiencies:

- The Jail was down 3 full time health techs for approximately 90 days;
- The Jail had *no* overnight RN for approximately 60 days;
- Employees from other areas were covering at the Jail (i.e., Assistant Director of Nursing);
- A rebate in the amount of $31,2000 for past vacancies would be given;
- A discount in the amount of $14,500 for April vacancies would be given; and
- Another promise to fix the issues in "June and beyond."

333.     These types of issues continued, as did their threat to inmate safety.

334.     On July 8, 2021 another inmate was found unresponsive, facedown with vomit on her lips, in a puddle of urine.  She later died at the hospital.

335.     Pacholl emailed Leonard and Larson on July 26, 2021 asking: "**Do you have any idea when your staffing levels will allow 24/7 nursing?**" (emphasis added).

336.     Pacholl's email went on to explain the impact of the lack of the required 24/7 nursing on safety and security at the Jail, including increased COVID exposures for inmates and staff which, in turn, created housing issues.  Pacholl noted that "[h]aving an overnight nurse will solve this issue and some other issues we are currently facing."

337.     Overnight nursing was an express term of the contract the County allowed MEnD to break from day one.

338.     On October 21, 2021, the Nursing Director for the Jail, Shelly Kiley, resigned in an email to Pacholl and Larson and others.

339.     An administrative assistant followed Kiley and resigned.

340.     On October 22, 2021, Pacholl again emailed Leonard, with Stuart copied, regarding "Staffing Issues":

Dr. Leonard:

Good Afternoon. I am contacting you about some staffing issues at our facility. It has come to my attention that the Nursing Director assigned to our facility, Shelly Kiley has put in her notice with MEnD. I am also aware that the MEnD Administrative Assistant assigned to our facility is leaving within the next two weeks. This will create significant staffing issues for the jail and other Anoka County Facilities. I am requesting that MEnD provide us with a short-term and long-term plan to address these vacancies. Please have MEnD's plan(s) to address these vacancies forwarded to us early in the week of October 24, 2021.

Thank you

341.     At this point, it had been a year of MEnD breaching its contract with the County and failing to provide the services the County required for its Jail population. Yet, all the County policymakers did was send written communication – only some of which were firmly worded, but all of which amounted to screaming into the void.

342.     Meanwhile, the County's inmates continued to suffer from the County's inaction.

343.     On November 4, 2021, the Jail was inspected by the DOC.  The DOC found two violations concerning medical care: (1) the medication refrigerator temperatures were not being logged according to what the DOC required, and (2) medications being destroyed were documented, but the medications were placed in an unsecure sharps container that could easily be removed –further highlighting the impact of inadequate medical staffing at the Jail.

344.     In mid-November 2021, around the time that Skroch received her Notice of Hearing from the Board of Nursing commencing a contested case, Larson emailed Anoka

54

County Chief Deputy Kevin Halweg regarding the *continuing* issues with MEnD and its failure to implement the Fusion EMR system.

345.    Within the email chain, Fusion personnel noted their cancellation of the weekly status call due to "prolonged inactivity, general non-responsiveness, and lack of resources allocated by MEnD" – similar conduct as described above.  As a result, the implementation of the electronic medical records system was placed on hold entirely, meaning another aspect of the Contract was *not* happening.

346.    Many of the issues noted by Fusion personnel stemmed from Skroch, who frequently failed to do the work she was tasked with (not an anomaly).

347.    Larson provided the Fusion emails to the Chief Deputy as "another example of MEnD's ineffectiveness."

348.    Larson noted MEnD staff failed to attend meetings and confessed "[y]ou know it's bad when another vendor sends an email like this!"  That is, Larson knew and admitted the situation with MEnD was bad as of November 2021, months before Green's incarceration.

349.    In November of 2021, the situation with MEnD had gotten so dire that the Minnesota Nurses' Association asked counties to terminate their contracts with MEnD. The union sent a letter to every county in the state that was using MEnD, including Anoka County.[30]

---

[30] A.J. Lagoe, Brnadon Stahl, Steve Eckert, *KARE 11 Investigates: Nurses union calls on jails to cut ties with controversial care provider*, Nov. 5, 2021, https://www.kare11.com/article/news/investigations/nurses-union-calls-on-jails-to-cut-ties-with-controversial-care-provider/89-4a8d903d-3c7c-49e5-83cd-0763c560f3d2.

350.    On December 7, 2021 Warkentin and Larson sent a deficiency letter to

MEnD.  The following were copied on the letter: Stuart; Rhonda Sivarajah, Anoka

County Administrator; Cindy Cesare, Division Manager – Human Service; and Bill

Keller, Director of Central Services – Risk Management.

351.    Within the December 7, 2021 letter the following continued deficiencies

were noted:

- **Staffing Shortages:**
  - Delayed inmate mental health screenings.
  - Delay in release of medical screenings/medication.  MEnD has failed to provide 24/7/365 on call mental health coverage for urgent consultation.
  - Hospital referrals – increased use for minor issues causes excessive OT costs for transporting deputies; adequate nursing staffing would alleviate.
- **Poor communication**:
  - No notification of MEnD staff turnover = problems with background checks, training, and on-boarding as well as security issues in delay security credentials removal when staff are terminated.
  - No attendance at monthly meetings as required by Contract.
  - EMR project stalled due to MEnD failure to attend meetings and training/testing.  Fusion has paused further work.
  - Cost Pool records issues for the jail – not complete; AC will be conducting an audit of the Jail cost pool only. "Anoka County Corrections is finding the cost pool situation unacceptable."

352.    The December 7, 2021 deficiency letter also included the following

expectations moving forward:

- a) Full nurse and mental health staffing immediately, or as soon as possible;
- b) Fusion implementation to be made a priority. The letter set a 15-day deadline for MEnD to set a date to finalize implementation (within 60 days); MEnD to attend all future meetings and trainings.

c) MEnD's commitment to future management-level staff attendance at regular meetings with Anoka County administrative staff beginning in December. (Physical or virtual attendance).

d) By the end of December, a full accounting of funds expended by Anoka County to be provided – County appears to have been paying for services that the County was not consistently receiving.

e) Adjustments in payments moving forward to offset services not provided but paid for – the accounting will show credits.

f) A written service plan by the end of December to document compliance with contractual obligations.

353.    But, even after engaging in the above-described letter-writing/email-writing campaigns, the County chose to allow MEnD to continue "providing" medical care to its inmates despite knowing that MEnD was in breach of the contract for over a year.

354.    On December 13, 2021, the County started looking for a replacement for MEnD but did not make any changes in the short-term to account for MEnD's deficiencies and their threat to inmate safety.

355.    In a December 17, 2021 letter, Leonard responded to the December 7 communication.  He promised improved performance and addressed several of the issues, many of which continued from December 2020, including: continued lack of overnight staffing; other staffing issues including mental-health services; communication issues; the ongoing Fusion debacle; lack of cost pool accountings; and the continued need for discounts due to the staffing shortages.

356.    The problems with MEnD described above would worsen in early 2022.

357.    On December 29, 2021, Leonard emailed undisclosed Anoka County personnel to announce that Dr. Roger Boettcher had been hired as "a" Medical Director who would be "responsible for oversight of clinical operations within Minnesota."

57

358.    The reason MEnD needed a new Medical Director was an Administrative Law Judge's Findings of Fact, Conclusion of Law and Recommendation issued on December 17, 2021 that recommended the MN Board of Medical Practice take significant disciplinary action against Leonard due to the horrifying and highly-publicized Hardell Sherrel death at the Beltrami County Jail under Leonard and Skroch's care.

359.    On January 3, 2022, the County, including Stuart and Larson, received information on Advanced Correctional Healthcare (ACH) from Dakota County.  The information compared ACH to MEnD.

360.    On January 11, 2022, Larson sent a second deficiency Letter to MEnD.

361.    This letter noted that the "payment credits in relation to service shortages" negotiated by former Jail Commander Pacholl were insufficient because "**the County prioritize[d] the provision of contracted services over financial credits" and "[did] not accept financial mitigation as adequate contract compliance.**" (bold in original).

362.    Despite the statement from Larson, past dealings under the contract showed the County *was* satisfied with financial mitigation.

363.    The letter warned the County was "exploring such remedies as invoking MEnD's performance bond" to cover the costs of hiring additional staff.

364.    Further, the January 11, 2022 letter criticized MEnD for failing to provide crucial overnight nursing coverage, noting that there was non-coverage from midnight to 6am.

365.    Despite Larson's acknowledgment that "**the County has a responsibility to maintain [medical] services for incarcerated people who are in our custody[,]**" the County chose not to invoke the performance bond prior to Green's incarceration. (emphasis added).

366.    Despite Larson's acknowledgment that "the County has a responsibility to maintain [medical] services for incarcerated people who are in our custody," the County chose not to hire additional medical staff to provide the critical overnight nursing coverage.

367.    The non-coverage issue continued through the end of Green's incarceration at the Jail, and beyond.

368.    Notably, the letter also stated: "We are aware that MEnD has recently had contracts with other Counties terminate[d]."

369.    Despite the benign description in the letter, in reality, it was publicly known that counties were voting to terminate contracts with MEnD *early.*

370.    For example, Beltrami County voted to terminate its contract effective in October 2021 – in the midst of its lawsuit stemming from the death of Hardel Sherrell, which sparked the earlier-mentioned FBI investigation into MEnD.[31]

---

[31] Jan. 5, 2021 Transcript of the Proceedings of the Beltrami County Board of Commissioners,  https://www.co.beltrami.mn.us/media/nm4djmck/2021-master-minutes.pdf.

371.    During MEnD's time working at the Jail, the number of medical

emergencies steadily increased.  In 2020, there were only 94 medical emergencies, while

in in 2021 there were 135 medical emergencies.  The number would rise again in 2022.

372.    Larson's January 11, 2022 letter also again set future expectations that

would not be met, including:

- Fusion implementation by 2.15.2022;
- MEnD to submit weekly scheduling documentation for Jail staffing starting no later than January 28;
- MEnD to commence weekly staffing meetings with Defendant Larson, Corey Kohan, and Nate Parker or their designees, starting the week of January 18.  MEnD attendees were to include Dr. Leonard or the Nursing Administrator; and
- Invoices and billings were to provide line-item documentation with specificity.

373.    Those expectations were not met.

374.    Around January 13, 2022, Larson wanted to know exactly what the County

was paying for and how MEnD was calculating the continued staff shortages for both

December 2021 and January 2022.  An administrative assistant undertook the task of

reaching out to MEnD.

375.    MEnD's response to this request was essentially, "no."

376.    On January 25, 2022, Leonard emailed undisclosed Anoka County

personnel informing them of the January 21, 2022 Final Order by the MN Board of

Medical Practice, which suspended Leonard's medical license indefinitely.

377.    The Board's Findings of Fact, Conclusions and Final Order further noted

that Leonard had "demonstrated a careless disregard for the health, welfare, or safety of"

a patient in his care; and "created an unnecessary danger to" a patient's "life, health, and safety."

378.    The Board's findings were made publicly available – consistent with its statement that the suspension of Leonard's license was "in the public interest."

379.    All of this occurred *before* Green was incarcerated at the Jail in February 2022.

380.    Below is the timeline leading to Leonard's suspension:

- The Notice of Hearing was issued **August 18, 2020;**
- The Evidentiary Hearing took place on **July 12-16 and 19, 2021;**
- The ALJ issued Findings of Fact, Conclusion of Law and Recommendation on **December 17, 2021**;
- The MN Board of Medical Practice convened on **January 8, 2022** (Leonard appeared with attorney David Bunde and presented argument); and
- The Final Order was signed, adopting the ALJ's recommendations, on **January 21, 2022.**

381.    Regardless of the loss of Leonard's license and the implementation of Dr. Boettcher as a medical director of MEnD, it was business as usual by way of medical staffing and care at the Jail.

382.    The staffing issues continued, as did the threat to inmate safety.

383.    For example, in February of 2022:

- There were only 5 full-time and 3 casual nurses (compared to the required 14).
- A new Anoka Facility Director was to start on February 7, 2022. (It is unclear how long they were without someone in this required role).
- There was *no* Jail Nurse Supervisor.
- There were only 2 full-time "providers" *with* MEnD and assigned to the Jail, as one (Leonard) was suspended.

384.    Despite the County's knowledge, via Stuart, Pacholl and Larson, of the significant issues with MEnD and the negative impacts on the Jail, it was not until long after Green was injured at the Jail that the County took any meaningful action to protect its inmates from MEnD's rampant deficiencies and provide them constitutionally adequate care.

385.    No action, outside of lip service, was taken against MEnD until the contract was terminated on July 11, 2022.

386.    Anoka County, through Stuart, Pacholl and Larson, permitted MEnD to operate in a dangerously understaffed manner that had observed negative impacts on the safety and security of both the inmates and staff at the Jail for over 19 months – from December 2020 to July 2022.

387.    Anoka County, through Stuart, Pacholl and Larson, had actual knowledge that the medical care provided by MEnD at its Jail was inadequate, incompetent, and understaffed before, during and after Green's incarceration.

388.    Anoka County, through Stuart, Pacholl and Larson, had actual knowledge not only that the medical care provided by MEnD at its Jail was inadequate, incompetent, and understaffed, but also that other counties were choosing to terminate their contracts with MEnD because of its widespread deficiencies and deliberate indifference before, during and after Green's incarceration.

389.    Rather than join other counties in cutting ties with MEnD, Anoka County doubled down, allowing MEnD to continue "providing" medical care to its inmates.

62

390.    Caring for inmates necessarily meant that MEnD personnel are **at** the Jail *and* **seeing** inmates – something that the County knew was not happening as required under the contract.

391.    Despite its awareness of MEnD's widespread issues in treating inmates at the Jail and other jails across Minnesota, Anoka County turned a blind eye and continued to use MEnD in its Jail to fulfill its nondelegable duty of providing constitutionally adequate healthcare to inmates.

392.    Despite its awareness of MEnD's issues in treating inmates at the Jail and in other county jails across Minnesota, Anoka County continued to defer to MEnD on all medical decisions, policies, and treatment for its inmates.

393.    Anoka County had actual knowledge that its agent – MEnD and its employees – were likely to violate the constitutional rights of inmates, and therefore it could not persistently fail to act or turn a blind eye.  Yet that is exactly what Anoka County did from December 2020 to July 2022, including during Green's incarceration in February 2022.

394.    The belated termination of Anoka County's contract with MEnD was largely attributable to financial concerns stemming from the County's investigation into MEnD's accounting and use of the cost-pool funds it fronted to MEnD.

395.    In an August 22, 2022 letter from an Anoka County Attorney, those financial issues and impacts were described in-detail, and **only then did the County draw the line**.

63

396.    The scathing letter started out noting MEnD "made such a mess of the medical billing accounting, which was its obligation under the contract, that the County…had to enlist [its] accounting department to spend a significant number of hours through 2022 in an effort to understand" what happened.

397.    The "mess" referred to by the County Attorney was MEnD's failure to properly pay outside medical providers (i.e., non-MEnD providers) that provided treatment to inmates out of the cost pool.

398.    This failure to properly pay the outside medical providers was another way MEnD breached the contract terms with the County.

399.    Around the end of 2021 the County became aware that the cost pool money was *gone* without an accounting of where it went or what it was used for, which resulted in "at least three problems" for the County; namely: 1) outside medical providers refused to see inmates due to non-payment for prior services; 2) the County could not decipher what bills had been paid or not; and 3) the County could not decipher if outstanding bills required repricing for medical assistance rates.

400.    However, as MEnD's track-record indicated *and* Palumbo warned, the decision to not pay for good medical care can *and should* be an even costlier decision for the County.

**February 2022 Incarceration: The Individually Named Defendants Gain Knowledge of Green's Serious Medical Needs**

401.    Green was convicted of felony possession of a controlled substance from an incident that occurred in Blaine, Minnesota, on August 26, 2019.

64

402. Green was originally assigned to the Anoka County Workhouse, where he arrived on January 21, 2022.

403. As noted earlier, Green had a valid prescription for Suboxone dated January 17, 2022, which was provided to the Workhouse and reportedly placed in the lock box.

404. Shortly after his arrival, Green left the Workhouse due to his addiction to heroin, and an arrest warrant was issued.

405. Green's Suboxone remained at the Workhouse – roughly 1 mile from the Jail.

406. MEnD personnel including Defendant Jensrud performed work for both the Workhouse and the Jail.

407. Green was arrested by Officer John Roth of the Coon Rapids Police Department on February 5, 2022, at 10:12 pm and was transported to the Jail, where he was booked by CO Sycks.

408. Green's Jail Intake Screening was completed by CO Sycks at 11:56 pm on February 5, 2022. Therein, Green admitted he was a daily heroin user via injection and that he last used on February 5, 2022 – earlier that same day.

409. Green also told CO Sycks that he had been informed he had hepatitis.

410. According to CO Sycks' direct observation, Green was an "urgent" referral to medical.

411. Green's Intake Screening was apparently "reviewed" on February 6, 2022, at 8:38 am by Skroch.

Date: 2. 6·22
Time: 0838
Reviewed By: _____

412.    Skroch claimed within her "Nursing Assessment and Plan" section of Green's Initial Health Assessment that he "declined to be seen" on February 6, 2022:

**Nursing Assessment and Plan***
2-6-22 Pt declined to be seen today. _____

413.    MEnD personnel used "declined" or "refused" synonymously with "did not happen," highlighting but one of MEnD's types of inaccurate record keeping.

414.    On February 6, 2022 at approximately 11:30 am, Green spoke to his mother by telephone, and they discussed his need for his medications from the Workhouse, including his Suboxone.

415.    Despite the *urgent* referral from CO Sycks to medical, Green's Initial Health Assessment was not conducted until 12:30 pm on February 7, 2022.

416.    An inmate who is an *urgent* referral to medical needs to be seen sooner than 36 hours after the referral.  Allowing this is a risk to both the inmate himself and to others at the Jail.

417.    Green's belated Initial Health Assessment was conducted by Calvario, who noted the following:

    a)  Green was currently taking 8 mg of Suboxone in the morning and at night (at the workhouse one week ago);

    b)  Green's Suboxone prescription fill date was listed as September 2021;

66

    c)  Green was currently a cigarette smoker and had been for five years;

    d)  Green had hepatitis C for 2-3 years;

    e)  Green's chemical dependency history was positive for heroin;

    f)  Green was drug tested and he tested positive for Buprenorphine, Amph and M-amph;

    g)  Green was negative on the Columbia-Suicide Severity Rating Scale (C-SSRS); and

    h)  Green was "started on chem withdrawal protocol and med orders submitted per provider.  Will continue to monitor and re-assess as needed."

418.    Notably, the Suboxone prescription fill date was inaccurately logged by Calvario, making it appear to be months older than it was (September 2021 versus January 2022).

419.    No "medical provider" ever signed Green's Initial Heath Assessment:



420.    From other records, including Green's Medication Administration Record, it appears the "provider" consulted was Jensrud.

421.    MEnD's Chemical Withdrawal Protocol consisted of medical staff's scoring of inmate-reported symptoms.  If the resulting cumulative score crossed a MEnD-created arbitrary threshold, the score would be reported to the "Medical Provider," who would then prescribe pharmacological band-aids for serious and life-threatening withdrawal symptoms.

422.    The staff's scoring of withdrawal symptoms was subjective and necessarily varied from person to person – that is, from one medical staff person to another.

423.    Calvario also completed Green's Medication Verification form. Therein, she noted Green's Suboxone prescription was filled, he had 30 pills, and they would be held "per provider."

424.    Upon information and belief, the "provider" who held Green's Suboxone was Jensrud.

425.    As described above, Suboxone is an important, FDA-approved medication used to treat opioid addiction.

426.    Suboxone works by binding to the same receptors in the brain as other opiates, such as heroin, and prevents cravings and allows people to work to fight their addiction and live a healthier and safer life.

427.    Stopping or abruptly cutting back on Suboxone can lead to severe and painful withdrawal symptoms like those of other opioids. Any reasonable medical provider would know this.

428.    Suboxone should be tapered when it is stopped. This can lessen the risk of withdrawals.

429.    Further, stopping or abruptly cutting back on opioids, such as heroin, after heavy use can lead to withdrawals.

430.    The Federal Bureau of Prisons Clinical Guidelines: Detoxification of Chemically Dependent Inmates-February 2014 provides:

68

> Medical detoxification is considered the standard of care for individuals with opiate dependence…Symptoms of withdrawal from short-acting opiates such as heroin can develop a few hours after the last use, peak within 36-72 hours and subside over 5-10 days.

431.    Green's prescription for Suboxone was verified by Calvario on February 7, 2022, via a pharmacist at Green's pharmacy in Champlin, Minnesota.

432.    It is deliberately indifferent to withhold an inmate's known and available prescribed medication.

433.    It is particularly dangerous (and deliberately indifferent) to withhold a prescribed medication from an inmate that is known to cause serious withdrawal symptoms when stopping suddenly.

434.    It is particularly dangerous (and deliberately indifferent) to withhold a prescribed medication that would alleviate severe opioid withdrawal symptoms from recent and persistent illicit drug use.

435.    It is particularly dangerous (and deliberately indifferent) to permit an inmate to experience prolonged, severe opioid withdrawal symptoms, without any effort to reduce or eliminate them.

436.    The deliberate indifference is all the more galling here because Geren's Suboxone medication was approximately 1 mile away *and* within the custody and control of the County.

437.    Around the same time as completing Green's Medication Verification form on February 7, 2022, Calvario completed Green's Chemical Withdrawal Questionnaire, noting the following regarding his illicit drug use:

69

| Drug | Amount of Use | Frequency of Use | Duration of Use | Last Use |
|------|---------------|------------------|-----------------|----------|
| heroin | 1g | daily | 6 years | 2/5/22 |
| meth | a point | a few times a week | 3-4 years | 2/5/22 |
| | | | | |

438.    Methamphetamine is a stimulant.

439.    The Substance Abuse and Mental Health Services Administration
"recommends patients withdrawing from stimulants should be monitored closely for
depression/suicidality, as well as prolonged QTc intervals and seizures, which may be
additional complications of stimulant withdrawal."

440.    Calvario noted historically, Green's withdrawal symptoms typically
included: sweats, bone aches, nausea and trouble sleeping.

441.    Calvario noted on the Chemical Withdrawal Flow Sheet that on February 7,
2022, Green was *already* experiencing withdrawal symptoms, including eating
disturbances, tremors, and sleep issues.  Green's pulse measured 104.

442.    Calvario's scoring severely underrated Green's suffering.  In reality, by this
point, he was vomiting, not eating, feeling horrible, and not sleeping due to the bone and
body aches and pains.

443.    Nonetheless, Calvario scored Green's withdrawals at an 11 – still above
MEnD's arbitrary threshold – and she reportedly contacted a medical provider.

444.    From the records available to Green to date, it is unclear which "medical
provider" was contacted, what credentials the "medical provider" held, the specifics of

any directions or orders from the provider, or whether they were implemented by Calvario or the other MEnD nursing staff who saw Green during his time at the Jail.

445.    Calvario further included the following within the "Note/Plan" section on the Withdrawal Flow Sheet regarding Green on February 7, 2022: "Patient said he is feeling nausea (sic) and has not been sleeping well.  Pt started on medications per provider.  Will follow up on 2/8 or as needed."

446.    By 12:54 pm on February 7, 2022, Green called his mother and described his withdrawal symptoms and informed her he had not received his Suboxone yet.

447.    Green's mother informed him that she had been making efforts to ensure individuals from the County – probation, the Workhouse and the Jail – knew he needed his Suboxone medication that remained at the Workhouse.

448.    Green's mother also informed him that she had been making efforts to ensure individuals from the County – probation, the Workhouse and the Jail – knew he got very sick when he was going through withdrawals.

449.    This would be Green's last call with his mother during his incarceration.

450.    As was typical with MEnD, Green's Medication Administration Record (MAR) shows four pharmacological band-aids were prescribed on February 8, 2022, by Jensrud, including:

    a)  Ondansetron – a medication to prevent nausea;

    b)  Clonidine – a medication used to treat anxiety;

    c)  Acetaminophen (e.g., Tylenol) – an over-the-counter medication used to treat fever and pain; and

95537616.1

d)  Ibuprofen (e.g., Advil) – an over-the-counter anti-inflammatory drug used to treat pain, fever and inflammation.

451.    It is unclear from the records which of the above-listed medications were offered to Green, when the medications were offered, or what medications he took.

452.    What is clear, however, is that despite knowing Green had Suboxone within the custody and control of the County, Green was not given Suboxone, and his medication was knowingly withheld from him.

453.    Regardless of whether or not Green received the band-aid medications prescribed by Jensrud, they were entirely insufficient to treat Green who: a) admittedly ingested heroin and meth the day he arrived at the Jail; b) had a valid prescription for Suboxone; and c) was visibly experiencing withdrawal symptoms.  Much like offering baby aspirin to someone experiencing extreme pain, these band-aids could do no more than briefly reduce Green's serious withdrawal symptoms without addressing their underlying *cause*, as the Suboxone would have.

454.    Green declined recreation and reportedly only accepted one meal on February 7, 2022, signaling the severity of his withdrawal symptoms.

455.    Things only worsened from there.

456.    On February 8, 2022, Calvario noted Green was experiencing the following withdrawal symptoms: eating disturbances, tremors, and sleep issues.  His pulse was 111 and blood pressure measured 132/87.

457.    Calvario's scoring again downplayed Green's true signs and symptoms.

458.    Green had already declined two meals on February 8.

459.    Nonetheless, Calvario scored Green's withdrawals at a 20 – nearly twice the day prior.

460.    Calvario reportedly contacted a medical provider.

461.    Calvario further included the following within the "Note/Plan" section on the Withdrawal Flow Sheet regarding Green on February 8, 2022: "Pt. said 'I can't keep anything down' and has not been able to sleep.  Informed Pt. that he has medications he can take to alleviate symptoms.  Provider notified of CW [chemical withdrawal] score. Will continue to monitor."

462.    The above is not a medical plan.

463.    Upon information and belief, no medical provider saw Green or wrote any additional prescription orders for him.

464.    Green did not receive dinner and declined recreation on February 8, 2022.

465.    The next day, Defendant Skroch filled out Green's Chemical Withdrawal Flowsheet for February 9, 2020.  She scored Green at a 13, noting continued eating disturbances, sleep issues and elevated pulse.

466.    Despite Green's continuing and worsening symptoms, Skroch's score was lower than Calvario's the day before – illustrating the futility of MEnD's subjective and arbitrary withdrawal scoring system.

467.    Still, Green's withdrawal score from Skroch remained high enough that nursing staff was required to contact the medical provider even under MEnD's arbitrary scoring system.

468.    Further, Skroch's narrative paints a more dire picture of Green's continued medical deterioration than the circles she made on the Withdrawal Flowsheet (highlighting the variability and arbitrary nature of MEnD's withdrawal scoring system). Skroch documented, in part, "Pt states he's been vomiting this AM – not eating.  Also states he's only been sleeping 1-2 hours at a time.  **Asking for suboxone**." (emphasis added).

469.    Green's Inmate Log Report noted that he accepted three meals, but this record calls that report into question.

470.    This documentation shows that Green and his mother repeatedly asked for him to receive his Suboxone, and healthcare "providers" at the Jail repeatedly withheld his prescribed medication from him.

471.    Reportedly Skroch contacted an unidentified medical provider.

472.    Skroch additionally documented in the "Note/Plan" section: "MAR reviewed + he has not been taking his W/D meds.  AM doses given now.  He kept them down for the next 20 mins.  He was in medical.  Will order clear liquid diet and recheck."

473.    Again, the "W/D" (withdrawal) medications referenced in Green's jail records are MEnD's pharmacological band-aids for withdrawal symptoms—anti-nausea medication, anti-anxiety medication, and over-the-counter fever medication—and not his prescribed and available Suboxone, one of the three drugs the FDA approved to treat opioid dependence and withdrawal.

474.    According to the MAR, Green was provided Ondansetron and Clonidine the morning of February 9, 2022 – again, the pharmacological band-aids and **not** withdrawal medication as Skroch claimed in her note.

475.    However, Suboxone **is** an FDA-approved prescription medication that **does** reduce opioid withdrawal symptoms and **treats** OUD.

476.    Due to Jensrud's hold order, Green never received any of his validly prescribed Suboxone while at the Jail.

477.    Upon information and belief, MEnD had a policy of withholding Suboxone from inmates and treating chemical withdrawal with the pharmacological band-aids described above.

478.    Skroch placed Green on a clear liquid diet on February 9, 2022.  It was to last for 48 hours – through February 11, 2022.

479.    While no concrete rationale was provided by Skroch for changing Green to a clear liquid diet on February 9, presumably it was due to his serious bouts of diarrhea and vomiting that continued and destroyed almost all his Jail-issued items on February 9, 2022.

480.    MEnD's "care" abruptly stopped on February 9.

481.    Yet, Green's medical condition continued to spiral downward.

482.    A February 9, 2022 Shakedown Sheet by Defendant Biah noted: "Inmate Green cell was covered in shit and vomit.  I helped inmate Green clean his cell.  I/M Green was provided with new clothing items."

483.    The Shakedown Sheet by Defendant Biah further noted that Green's miscellaneous food items, two blankets, three t-shirts, three socks, three pairs of underwear and one bed roll were all thrown in the trash, presumably because they were destroyed by vomit.

484.    Incredibly, and with deliberate indifference to Green's medical condition, Biah gave Green "a verbal warning about keeping his cell neat and clean" and made him clean up his bodily fluid.

485.    Biah did not note what time the shakedown of Green's cell occurred.

486.    Biah did not describe the shakedown on Green's well-being check log.

487.    Biah failed to document any observations regarding Green's well-being or lack thereof.

488.    Biah also failed to document accurate information regarding the above incident and his verbal warning to Green on his "End of Shift Report."

489.    Biah noted no unit intel, no inmate intel, no violations or verbal warnings outside of routine facemask wearing, and no medical concerns – despite Green's obvious, serious medical issues.

490.    Instead, there is only a note that because Green was vomiting and defecating on himself, the next shift should keep an eye on him.

491.    However, Biah then explained in the note that medical saw Green early in the morning and said he was "okay."

492.    It is unclear exactly when Biah was informed Green was "okay" – or whether it occurred at all.

493.    However, from the available records, Green was seen by medical (Skroch) at 9:50 am on February 9, 2022.  And, despite her note that she put him on a liquid diet and would "recheck," she did not see Green again.

494.    Skroch's notes on her visit with Green do not include any information from Biah.

495.    Green was not okay when Skroch saw him.

496.    Green was not okay when Biah saw him.

497.    Biah, despite observing that Green was experiencing withdrawal symptoms, chose not to notify a supervisor.

498.    Biah chose to do nothing to obtain medical care or otherwise assist Green.

499.    Because of Biah's deliberate indifference, no supervisor was required to ensure the appropriate medical staff was notified so that Green could receive treatment for his worsening severe withdrawal symptoms on February 9, 2022.

500.    Even still, the limited written documentation that Biah did create provided additional notice to correctional staff regarding Green's deteriorating medical condition.

501.    On the same day, Green's mother called and left a message asking if he had gotten his withdrawal medications for his severe withdrawal symptoms, as well as his anxiety medication.

502.    Green had not still received his Suboxone or anxiety medication.

503.    Green did not communicate with his mother on February 9, 2022.  He was too ill to do so.

504.    There were zero well-being checks logged that described Green's behavior, deterioration, signs of life or any observations by COs on February 6, 7, 8 or 9.

505.    This custom, pattern or practice would continue for Green's entire incarceration, ensuring a lack of documentation of Green's serious medical needs by the individually named CO Defendants.

506.    Green's deterioration continued through February 10, 11 and 12.

507.    But, Green's deterioration was memorialized by the portions of Jail video surveillance that Anoka County preserved – namely for February 10, 11 and 12.

508.    However, even on those days where video evidence was preserved, there are portions were not.

509.    According to Anoka County, the missing portions of video evidence on February 10, 11 and 12 occurred because Green was not captured on any Jail video for those time periods and, therefore, it was not saved.

510.    When video was not saved for February 10, 11 and 12, Green was in his cell suffering from severe withdrawal symptoms that persisted without any medical intervention.

511.    As for the other video surveillance of Green during his incarceration from February 6 through 9, the Jail allowed the entirety of the evidence to be deleted, despite other evidence illustrating he deteriorated on those days.

512.    Nonetheless, the available video evidence very much puts into question claims of proper well-being checks by COs during Green's incarceration – including by Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford.

78

513.    Further, the available video evidence shows a lack of "direct supervision" by COs during Green's incarceration – including by Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford.

514.    The evidence shows deliberate indifference on behalf of Biah, Vang, Fields, Kramer, Kong, Parks and Stafford through both their well-being checks and their direct supervision of Green, who was suffering from obvious and serious medical conditions.

515.    Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford either: 1) could not be bothered to perform the required well-being checks on Green; 2) completed checks at too fast of a pace or did not look into his cell, amounting to no checks at all; 3) observed Green's obvious and serious medical needs during well-being checks and did nothing; and/or 4) observed Green's obvious and serious medical needs while in his housing unit with him and did nothing.

516.    On February 10, 2022, Defendants Fields, Vang and Biah were Housing Deputies for Green's unit.

517.    Defendants Fields, Vang and Biah logged zero well-being checks for Green on February 10, 2022.

518.    Defendants Fields, Vang and Biah logged zero entries that described Green's behavior, deterioration, signs of life or *any* of their observations for February 10, 2022.

519.    Defendants Fields, Vang and Biah acted in accordance with the County's custom, pattern or practice which ensured a lack of documentation by COs of inmates' serious medical needs.

95537616.1

520.    Further, the entries Defendant Fields did log were inaccurate – entirely failing to detail significant, observed events.

521.    For example, Fields logged that Green accepted breakfast and lunch.

522.    The objective video evidence shows that shortly after "accepting" the meals, Green gave them away to another inmate.  For example, the below exchange of Green's food happened *while* Fields was watching:



523.    Green did not eat either of the meals logged by Fields.

524.    Notably, both the offered meals failed to comport with the order for Green's liquid diet.

525.    The objective video evidence also shows around 12:50 pm on February 10, 2022, Green went to medication pass but did not receive medication.

526.    On February 10, 2022, it was noted that Green "refused" to be seen in medical.

527.    Green was too ill to get to medical.

528.    Green was curled in a fetal position on his bunk – the **top** bunk – when either Defendant Fields or Vang called out that was it was time for a nurse's run (i.e., when inmates were told they could make the trek down to the medical clinic).

529.    An inmate who has destroyed his cell with bodily fluids the day prior and clearly had little by way of nutrition or fluids for days needs to be seen by medical whether he can make it to the clinic or not.

530.    Defendant Skroch made no effort to see Green, despite his continuing deterioration, worsening chemical withdrawal symptoms and inability to make it to the clinic.

531.    Further, while Vang was on duty in Unit 6, the objective video evidence shows Green did not accept dinner on February 10, 2022.

532.    Biah was one of the Housing Deputies in Unit 6 overnight from February 10 to 11 where he was tasked with monitoring Green who had by then not eaten *any* of his three meals the day after Biah observed his cell destroyed with Green's bodily fluids.

533.     Green's continued failure to consume food, combined with his history of covering his cell in bodily fluids, provided further notice to correctional staff including Defendants Fields, Vang and Biah regarding Green's deteriorating medical condition.

534.     Defendants Fields, Vang and Biah chose to do nothing to obtain medical care or otherwise assist Green.

535.     Green's medical deterioration continued throughout February 11, 2022.

536.     On February 11, 2022, Defendants Kramer, Kong and Parks were Housing Deputies for Green's unit.

537.     Parks' shift ran into the early morning hours of February 12, 2022.

538.     Defendant Stafford was the Duty Supervisor for Parks's shift.

539.     Defendants Kramer, Kong, Parks and Stafford failed to log any well-being checks for Green on February 11, 2022.

540.     Defendants Parks and Stafford failed to log any well-being checks for Green on February 12, 2022.

541.     Defendants Kramer, Kong, Parks and Stafford failed to log any entries that described Green's behavior, deterioration, signs of life or any CO observations for February 11, 2022, even as he deteriorated further.

542.     Defendants Kramer, Kong, Parks and Stafford acted in accordance with the County's custom, pattern or practice which ensured a lack of documentation by COs of inmates' serious medical needs. Despite the lack of documentation regarding Green, video evidence shows Green's continued deterioration on February 11, 2020 – something that was observed and observable to Kramer, Kong, Parks and Stafford.

82

543.    The objective video evidence from February 11, 2022, shows Green fainted in the meal line at approximately 7:09 am, causing him to fall straight back onto the floor.

544.    Green's fainting occurred while Defendant Kramer was performing the task of meal pass at the same entrance door/window pictured above at paragraph 522.

545.    Kramer chose to do nothing to obtain medical care or otherwise assist Green.

546.    The objective video evidence from February 11, 2022 shows Green was unsteady on his feet post-fainting.  He took the stairs slowly, one at a time, while using the railing for support.

547.    The objective video evidence from February 11, 2022 also shows Green needed to sit and rest, when he resumed waiting in line for the meal pass post-fainting.

548.    The objective video evidence from February 11, 2022 shows Green was given a breakfast bag by Defendant Kramer, despite his liquid diet order.

549.    Green then gave his breakfast bag to another inmate in exchange for a beverage, in plain view of Kramer:



550.    Green continued to be unable to eat because he would throw it up.

551.    Green attempted to drink orange juice to help his body, but he threw that up too.

552.    The objective video evidence from February 11, 2022 shows other inmates took it upon themselves to provide Green with extra liquids because he weas obviously very ill:

95537616.1



553.    Still Kramer chose to do nothing to obtain medical care or otherwise assist Green.

554.    While it is unclear from the video or written record whether Green was offered a meal in accordance with the order for his liquid diet by Defendant Kramer or Kong, the objective video evidence confirms Green did not have lunch on February 11, 2022.

95537616.1

555.    Green also declined recreation on February 11, 2022.

556.    The objective video evidence from February 11, 2022 shows Green's continued confusion as he staggered into the hallway with his pants around his ankles.

557.    The objective video evidence from February 11, 2022 depicts Defendant Kong provided Green with four cups around 5:06 pm:



558.    The objective video evidence from February 11, 2022 continued to depict a confused Green.  He staggered around the Unit, confused, looking for his cell.

95537616.1

559.    Green attempted to enter his cell through the wrong part of the door – the hinged-side versus the handle side.

560.    Kong chose to do nothing to obtain medical care or otherwise assist Green.

561.    The objective video evidence from February 11, 2022, shows Green retired to his cell, cell 530, around 5:08 pm without any food or drink, where he would remain until being taken to the hospital.

562.    Green missed 6 meals in two days – the two days after Jail employees knew he  had vomited and defecated all over his cell, destroying all Jail-issued items.

563.    Still Kong did nothing to help Green.

564.    The objective video evidence from February 11, 2022 captured numerous examples of Green's continued medical deterioration, which were visible to Defendants Kong and Kramer.

565.    The objective video evidence from February 11, 2022 captured numerous examples of Green's continued medical deterioration, which were appreciated by other inmates within Level 4, Unit 5.

566.    Green did not engage in normal behavior of an inmate within a housing Unit on February 11, 2022.

567.    Around 8:22 pm on February 11, 2022, Defendant Kong opened the door to Green's cell and peered inside.

568.    Defendant Kong had similar, other opportunities to view Green, but did nothing to help him, instead allowing Green to suffer and continue to deteriorate.

87

569.    The task of performing well-being checks on Green (who had remained in his cell) overnight on February 11, 2022 and into the early morning hours of February 12, 2022 fell mainly on Defendant Parks, with Defendant Stafford making rounds as the Duty Supervisor.

570.    Like Kramer and Kong, Defendants Parks and Stafford had opportunities to view Green in pain, suffering through severe opioid withdrawal, but did nothing to help him.

571.    Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford, acting with deliberate indifference, ignored what they knew: that Green was ill, medically deteriorating, not eating, vomiting, having uncontrollable diarrhea and suffering from withdrawals.

## Issues with February 2022 WBCs and Interactions

572.    With regard to well-being checks at the Jail from February 5 to February 12, 2022, without video evidence – much of which is missing – there is no way to know *who* conducted the checks, *when* the checks were completed, *how long* the COs spent with the inmate, and in *what* condition the COs observed the inmate, including Green.

573.    Given that video was often viewed by the DOC inspectors to review incidents and conduct inspections (i.e., to find out what happened), the same issues with inmate logs from the Jail were likely true in years past.

574.    Chapter 2911.5000 and the regulating agency for Minnesota correctional facilities – the DOC, through its inspections of the Jail – clearly require a policy and practice for conducting proper well-being checks.

575.    While the same is true for the written policy at the Jail, the custom and practice clearly show otherwise.

576.    In 2022, the Anoka County Custody Manual at Policy 504.3 provided COs shall adhere to the following when conducting well-being checks:

a) Well-being checks shall be conducted at least once every 30 minutes and more frequently if necessary.

b) Well-being checks shall be conducted on an irregular schedule (staggered) so that inmates cannot predict when the checks will occur.

c) Well-being checks shall be done by personal observation of the deputy and shall be sufficient to determine whether the inmate is experiencing any stress or trauma.

d) Cameras and monitors may supplement the required visual observation well-being checks but they shall not replace the need for direct visual observation.

e) Well-being checks will be clearly documented in the Jail well-being check system (Minn. R. 2911.5000, Subp. 5). If a well-being check does not occur due to an emergency, the missed check be entered as a late note with an explanation addressing why the entry was missed.

f) Actual times of the checks and notations should be recorded in the jail well-being check system.

g) Log entries shall never be made in advance of the actual check. Log entries made in this manner do not represent factual information and are prohibited.

h) Special management Inmates shall be checked more frequently as detailed in the Special Management Inmates Policy.

i) Staff of the opposite gender will announce their presence when entering an inmate housing unit (115.15 (d)).

577.    As described above, nothing of the sort happened for Green by *any* CO.

578.    Further, there is a complete lack of documentation regarding observations from COs, including Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford, who spent time with Green in his housing unit.

579.    Green exhibited and described a number of signs and symptoms of a serious medical condition throughout his incarceration described above, including but not limited to: fainting, diarrhea, vomiting and other signs of opioid withdrawal.

580.    The seriousness of the risk to an inmate with uncontrolled vomiting and diarrhea increases if the symptoms have been present for days (*e.g.*, Ms. Rudolph).

581.    Persistent vomiting and diarrhea can cause dehydration.

582.    Persistent vomiting and diarrhea can cause hypernatraemia (elevated blood sodium level).

583.    Persistent vomiting and diarrhea can lead to heart failure.

584.    Both persistent vomiting and diarrhea, particularly when uncontrolled and covers a jail cell, were observable red flags to COs performing well-being checks or tasked with direct supervision of the inmate's unit.

585.    Again, the seriousness of such red flags and the risk to an inmate increases exponentially when – as with Green – they were present for *at least* three days.

586.    The combination of these symptoms *and* missing several meals – here: *at least 6 in the two days post-destroying a cell with bodily fluid* – is an even deadlier combination.

587.    Green was *not* well during his incarceration – he was far from it.

588.    If Green was "healthy" during his incarceration at the Jail – he was not – he should have been checked upwards of 240 times between February 6 and February 10, with many of those denoting signs and symptoms.

589.    By the Chapter 2911 administrative rules, the direct supervision philosophy of interacting with inmates, the Jail's written policies, and simple common sense, Green's deteriorating condition and manifested withdrawal symptoms mandated checks at intervals more frequent than every 30 minutes.

590.    Yet, no Defendant increased his watch frequency.

591.    Since Green was within a "special need classification" due to his withdrawal, he required more frequent checks, upwards of 480.

592.    Despite this, Green's "Inmate Log Report" shows only a total of 16 logged checks:

- 15 well-being checks on February 6, 2022;

- 0 well-being checks on February 7, 2022;

- 0 well-being checks on February 8, 2022;

- 1 well-being check on February 9, 2022;

- 0 well-being checks on February 10, 2022; and

- 0 well-being checks on February 11, 2022.

593.    This type of documentation was the custom, pattern or practice at the Jail.

594.    Upon information and belief, the same type of documentation seen for Green occurred for the other inmates at the Jail during his incarceration.

95537616.1

595.    Upon information and belief, the same type of documentation seen for Green occurred for other inmates incarcerated prior to Green's incarceration at the Jail and after the Guardian system had been installed.

596.    The same type of documentation seen for Green occurred for other inmates despite COs having the ability to log checks in real time while easily denoting their observations via the Guardian system (i.e., the *reasons* the County shifted away from its manual system to the Guardian system in 2019).

597.    The same type of documentation seen for Green occurred for other inmates despite the requirements of Chapter 2911 and the Jail's own policy.

598.    There was a custom, pattern or practice at the Jail by which COs failed to properly document well-being checks *and* notations about their observations of inmates, as required by Chapter 2911 and the Jail's written policy.

599.    Due to this custom, pattern or practice, COs knew they could not be held accountable for conducting improper well-being checks unless video was reviewed.

600.    Upon information and belief, like in Green's case, the video evidence is not reviewed with an eye to determining if a CO violated policy.

601.    There was no investigation into the conduct of the Defendant COs or Green's injury even though one was required by Anoka County Policy Manual 806.

602.    Anoka County Policy Manual 806.3 provides that "[w]henever there is a report of an injury to an inmate that is the result of accidental or intentional acts, other than an authorized use of force by custody staff, the Operations Lieutenant will initiate and investigation to determine the cause of the injury."

92

603.    As a result of the foregoing, COs knew they would not be held accountable for conducting proper well-being checks.

604.    Despite the lack of documentation of the proper number of well-being checks (par for the course at the Jail), the evidence shows Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford interacted with and observed Green as he was deteriorating.

605.    Any CO who laid eyes on Green necessarily observed a very sick individual.

606.    The inmates who offered him additional liquids knew Green was ill.

607.    Green's cell neighbor, who could not *see* him, knew Green was in trouble.

608.    Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford had the opportunity to observe and did observe Green's serious *and* obvious medical needs due to his persistent and *worsening* withdrawal symptoms while under their custody, supervision, and control.

609.    Yet, Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford did nothing as Green suffered from severe, persistent and worsening withdrawal symptoms.

**The Individual Defendants' Deliberate Indifference to Life-Threatening Opioid Withdrawal Collides with the County's Deliberate Indifference**

610.    Throughout Green's confinement at the Jail, he displayed and reported signs of obvious and serious medical issues, including but not limited to substance abuse and withdrawal.

611.    Defendants' rampant misconduct ultimately culminated in Green's fall in his cell, severe injuries, hospitalization and continuing medical issues.

612.    All of the individually named Defendants *knew* Green was not well at various times during his incarceration.

613.    All of the individually named Defendants chose to ignore what they knew.

614.    Not acting on their knowledge is textbook deliberate indifference.

615.    Defendants Skroch, Calvario, Jensrud, Biah, Vang, Fields, Kramer, Kong, Parks and Stafford chose to ignore the obvious signs and symptoms of Green's serious medical condition.

616.    Defendants Skroch, Calvario, and Jensrud deliberately ignored withdrawal protocol for Green's admitted use of drugs just prior to his arrival at the Jail *and* withheld his valid and necessary prescription for Suboxone that was in close proximity and would have actually treated his serious medical needs.

617.    Green's display and reports of his serious medical issues mandated further evaluation and treatment immediately, but none occurred prior to EMS's arrival.

618.    As the video surveillance, and at times written documentation, shows Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford observed Green as he was exhibiting and suffering from signs and symptoms of obvious and serious medical needs.

619.    Had *any* individually named Defendant taken *any* appropriate action with regard to Green, the result would have been very different.

94

620.    The Jail's custom, pattern or practices ensured that the COs would fail to take any appropriate action with regard to Green.

621.    Combining that with the County's decisions to: 1) contract with MEnD – a deliberately indifferent provider; and 2) continue working with MEnD throughout Green's incarceration at the Jail despite all the County knew *beforehand* about MEnD, unsurprisingly resulted in near deadly consequences.

622.    Green incurred special damages, including but not limited to ambulance and EMS changes, medical bills from Mercy Hospital and HCMC, and additional treatment after his discharge, as a result of the Defendants' misconduct.

623.    Green experienced extreme physical and mental pain and suffering during his confinement at the Jail and thereafter, which continue to the present, due to the multifocal injuries he sustained as a result of the rampant deliberate indifference by both the individually named Defendants and the County.

624.    Green continues to experience symptoms relating to the injuries he sustained at the Jail, which greatly affect his daily life.

## COUNT ONE

**42 U.S.C. § 1983**
**EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS**
***Plaintiff v. Defendants Michelle Skroch, Monica Calvario, and Holly Jensrud, in their individual capacities as medical staff at the Jail***

625.    Green realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

626.     Upon his arrival to the Jail, medical and correctional staff knew that Green had recently used heroin and methamphetamine.

627.     Substance abuse and illicit- and prescription-drug withdrawals are serious medical needs.

628.     Shortly after Green's arrival to the Jail, he both reported and exhibited multiple, obvious and progressing medical issues.

629.     Defendants Skroch, Calvario, and Jensrud had a constitutional duty to provide for the safety and general well-being, and to treat the serious medical needs, of Green.

630.     Defendants Skroch, Calvario, and Jensrud, under color of state law, acted with deliberate indifference to Green's serious medical needs during his confinement at the Jail by consciously ignoring the red flags that illustrated Green was a very ill individual, in acute distress, clinically declining and in need of medical attention, intervention and treatment.  These actions or inactions were done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

631.     Defendants Skroch, Calvario, and Jensrud, under color of state law, further acted with deliberate indifference to Green's serious medical needs during his confinement at the Jail by consciously choosing not to provide him with his prescribed and available Suboxone.  These actions or inactions were done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

632.     Defendants Skroch, Calvario, and Jensrud, under color of state law, knew of and consciously disregarded obvious and serious risks to Green's health and safety and

acted with deliberate indifference, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

633.    Defendants Skroch, Calvario, and Jensrud subjected Green to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated by their actions.

634.    Green suffered from severe opioid withdrawal symptoms, which led to a litany of other serious medical issues due to his resultant fall, including multifocal intraparenchymal hemorrhage, subdural and subarachnoid hemorrhage, occipital epidural hematoma, acute renal failure, hyponatremia, hypochloremia, and pneumomediastinum.

635.    Green suffered greatly during his incarceration as his withdrawal symptoms worsened and he lived in his own bodily fluids and vomit.

636.    Green suffered from Defendants Skroch, Calvario, and Jensrud withholding his prescribed Suboxone medication from him.

637.    Green also suffered greatly from his painful fall and resultant injuries.

638.    Green exhibited obvious signs and symptoms of serious opioid withdrawal and quickly deteriorated during his stay at the Jail, and he suffered as a result of the conscious choices from available alternatives made by Defendants Skroch, Calvario, and Jensrud not to seek care, intervention or treatment, or provide him with his previously prescribed and available Suboxone.

639.    Punitive damages are available against Defendants Skroch, Calvario, and Jensrud and are hereby claimed as a matter of federal common law under *Smith v. Wade*,

461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the

differing standard of proof set forth in Minn. Stat. § 549.20.

640.     Green is entitled to recovery of his costs, including reasonable attorneys'

fees, under 42 U.S.C. § 1988.

## COUNT TWO

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford, in their*
*individual capacities as correctional officers at the Jail*

641.     Green realleges and incorporates by reference herein each and every

allegation contained above as if set forth fully herein.

642.     Substance abuse and illicit- and prescription-drug withdrawals are serious

medical needs.

643.     Shortly after Green's arrival to the Jail, he both reported and exhibited

multiple, obvious and progressing medical issues.

644.     Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford had a

constitutional duty to provide for the safety and general well-being of Green.

645.     Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford, under

color of state law, acted with deliberate indifference to Green's life-threatening medical

needs during his confinement at the Jail, in violation of the Eighth and Fourteenth

Amendments to the United States Constitution, by consciously ignoring the obvious red

flags that illustrated Green was an ill individual, clinically declining and in need of

98

medical attention, intervention and treatment. These actions or inactions were done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

646. Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford observed Green in his Unit.

647. Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford's observations of Green occurred when he was obviously suffering from a severe medical condition.

648. Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford, under color of state law, knew of and consciously disregarded obvious and serious risks to Green's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

649. Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford subjected Green to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated by their actions.

650. Green suffered from severe opioid withdrawal symptoms, which led to a litany of other serious medical issues due to his resultant fall, including multifocal intraparenchymal hemorrhage, subdural and subarachnoid hemorrhage, occipital epidural hematoma, acute renal failure, hyponatremia, hypochloremia, and pneumomediastinum.

651. Green suffered greatly during his incarceration as his withdrawal symptoms worsened and he lived in his own bodily fluids and vomit.

652. Green also suffered greatly from his painful falls and resultant injuries.

653.    Green exhibited obvious signs and symptoms of serious opioid withdrawal and quickly deteriorated during his stay at the Jail and suffered as a result of the conscious choices from available alternatives made by Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford not to seek care, intervention or treatment, and to fail to check Green's well-being.

654.    Punitive damages are available against Defendants Biah, Vang, Fields, Kramer, Kong, Parks and Stafford and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

655.    Green is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT THREE

### CIVIL RIGHTS VIOLATIONS UNDER
*MONELL V. DEP'T OF SOCIAL SERVICES*
*Plaintiff v. Defendant Anoka County*

656.    Green realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

657.    Defendant Anoka County is liable under *Monell* for deliberate indifference as it relates to MEnD and its agents.

658.    First, with deliberate indifference, Defendant Anoka County entered into the contract with MEnD.

95537616.1

659.    Second, with deliberate indifference, Defendant Anoka County continued to permit MEnD and its agents to work as the contracted medical provider at the Jail despite all of the County's knowledge regarding MEnD operating in breach of the contract.

660.    In many ways, MEnD's operation at the Jail in breach of the contract was to the detriment of inmates, including Green, posing risks to their health and safety.

661.    Defendant Anoka County had a nondelegable duty to provide medical care under the United States Constitution to Green.

662.    While a municipality, such as Anoka County, can contract with a private medical provider such as MEnD to provide medical services to inmates, doing so "does not relieve [it] of its constitutional duty to provide adequate medical treatment to those in its custody," nor does it immunize a municipality from liability for failing to fulfil that duty. *West v. Atkins*, 487 U.S. 42, 56 (1988).

663.    When an inmate has serious medical needs that require medical treatment, the County through "prison officials [is] under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989).

664.    Upon his arrival to the Jail, it was known that Green had recently used heroin and methamphetamine.

665.    Substance abuse and illicit- and prescription-drug withdrawals are serious medical needs.

666.    Shortly after Green's arrival to the Jail, he both reported and exhibited multiple, obvious, and progressing medical issues.

667.    During his incarceration, Green suffered from obvious and serious medical needs that required medical treatment, which was not furnished to him.

668.    The duty to furnish medical care was Anoka County's and was nondelegable, notwithstanding its contract with MEnD.

669.    Treatment for Green (and others) failed to occur due to Anoka County's deliberate indifference in entering into the contract with MEnD, despite the County's knowledge that MEnD was a deliberately indifferent medical provider, both at the time it entered into the contract and through the point it terminate the contract in August 2022, well after Green suffered injuries.

670.    MEnD's policies and practices are those of Anoka County because the County's constitutional duty is nondelegable.  Anoka County is therefore liable for MEnD's constitutionally infirm policies, customs, or practices as applied to Green.

671.    Upon information and belief, MEnD had a policy of withholding Suboxone and failing to administer it to inmates who had a prescription for it.

672.    Instead, MEnD followed its own "Chemical Withdrawal Protocol" with its own arbitrary, proprietary forms and administered drugs to inmates experiencing withdrawal that were woefully insufficient to treat their serious, life-threatening symptoms.

673.    Anoka County, by contracting with and the course of dealing with MEnD, gave final policymaking authority to MEnD regarding inmate medical care, and it deferred to MEnD's unconstitutional policies and practices relating to the administration of prescription medication and the treatment and monitoring of inmates experiencing

95537616.1

withdrawal. A "private company's policy becomes that of the County if the County delegates final decision-making authority to it." *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705–06 (11th Cir. 1985)).

674.    Because it had previously been sued over a failure to administer prescribed medications to a pretrial detainee and participated in the litigation, Anoka County knows that denying a person medication that has been prescribed is unconstitutional. *Dadd v. Anoka County*, 827 F.3d 749, 757 (8th Cir. 2016).

675.    Green's injuries were directly and proximately caused by MEnD's unconstitutional policies, customs or practices of abruptly terminating prescribed Suboxone without tapering or appropriate withdrawal monitoring *and* failing protect Green from the well-known, serious risks of stimulant and opioid withdrawal.

676.    Anoka County is therefore liable for these constitutional deficiencies in an amount as yet to be determined.

677.    Anoka County was also on notice prior to Green's incarceration – and as stated above, even prior to entering into the contract – that MEnD's policies, practices, and customs resulted in constitutionally inadequate medical care for inmates.

678.    Anoka Count was also on notice regarding MEnD's glaring and persisting deficiencies that had negative impacts on inmates' safety. These issues were well-known and well-documented by the County via Stuart, Pacholl, Larson, and others.

679.    Green's injuries were the result of Anoka County's inaction and failure to remedy the known, systemic issues MEnD perpetuated throughout the "performance" of the contract.

680.    Unlike Anoka County, other counties severed ties with MEnD after being made aware of its serious, dangerous, and systemic issues.  Dakota County signed an emergency contract with another medical provider.[32]  Wright County terminated its contract with MEnD after the state revoked Leonard's medical license, citing MEnD's "legal and ethical problems."[33]

681.    As of February 2022, Anoka County knew of MEnD's constitutionally deficient medical care and unconstitutional customs and practices, yet with deliberate indifference to the rights of Green and other similarly situated inmates, allowed MEnD to provide constitutionally deficient medical care to inmates at the Anoka County Jail, including Green.

682.    Further, treatment for Green also failed to occur due to Anoka County's initiation, tolerance of, permission of, failure to correct, promotion of or ratification of a custom, pattern and practice on the part of medical staff at the Jail, including Defendants Calvario and Jensrud, of failing to provide for the safety and general well-being of

---

[32] A.J. Lagoe, Brandon Stahl, Steve Eckert, *KARE 11 Investigates: Counties cut trouble jail medical company,* April 20, 2022, https://www.kare11.com/article/news/investigations/cruel-and-unusual/kare-11-investigates-counties-cut-jail-medical-company/89-453d9b64-9b60-4192-8fa1-7e62baf933a1.
[33] *Id.*

inmates, failing to care for inmates suffering from obvious and serious medical needs, and failing to seek necessary medical care for inmates.

683.    Third, Defendant Anoka County is also liable under *Monell* for deliberate indifference relating to the Jail correctional staff.

684.    There is the deliberate indifference of the Jail correctional staff to Green's obvious, serious – in fact, life-threatening – medical needs while he was under their custody and control.

685.    The individually named CO Defendants' failure to obtain medical care or otherwise assist Green as he suffered from obvious and serious medical needs was due to Anoka County's initiation, tolerance of, permission of, failure to correct, promotion of or ratification of a customs, patterns and practices that permitted them to fail to provide for the safety and general well-being of inmates, fail to care for inmates suffering from obvious and serious medical needs, and fail to seek necessary medical care for inmates.

686.    Anoka County's longstanding initiation, tolerance of, permission of, failure to correct, promotion of or ratification the customs, patterns or practices of: 1) COs that could not be bothered to perform well-being checks; 2) COs performing well-being checks in such a perfunctory manner as to amount to no checks at all; and/or 3) COs performing well-being checks and choosing to do nothing to help inmates with observed or observable serious medical needs – resulted in the individually named CO Defendants' failure to obtain medical care or otherwise assist Green during his incarceration.

687.    Additionally, Anoka County's longstanding initiation, tolerance of, permission of, failure to correct, promotion of or ratification the customs, patterns or

practices of permitting COs to ignore individuals suffering from known and severe opioid withdrawal despite their observation and interaction with inmates through direct supervision resulted in the individually named CO Defendants' failure to obtain medical care or otherwise assist Green during his incarceration.

688. Anoka County entirely failed, time and time again, to correct the several, persistent and known issues at the Jail that negatively impacted safety and security.

689. Green exhibited obvious signs and symptoms of serious opioid withdrawal and quickly deteriorated during his stay at the Jail, and he suffered as a result of the County's multifaceted deliberate indifference that resulted in Green receiving no care, intervention or treatment for his obvious and serious medical needs.

690. Green is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Deyonta D. Green prays for judgment against Defendants as follows:

1. That this Court find that the Defendants committed acts and omissions constituting violations of the Eighth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983.

2. As to Count I, a money judgment against Defendants Michelle Skroch, Monica Calvario, and Holly Jensrud for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

95537616.1

3.    As to Count II, a money judgment against Defendants Biah, Vang, Fields,

Kramer, Kong, Parks, and Stafford for compensatory and punitive damages in amounts to

be determined by the jury, together with costs, including reasonable attorneys' fees,

under 42 U.S.C. § 1988 and prejudgment interest;

4.    As to Count III, a money judgment against Defendant Anoka County for

compensatory damages in an amount to be determined by the jury, together with costs,

including reasonable attorneys' fees, 42 U.S.C. § 1988 and prejudgment interest;

5.    For an order mandating changes in the policies and procedures of the

Anoka County Jail, requiring among other things, changes to policies and training to

ensure that prescription medications carrying known and obvious withdrawal risks are

properly administered; and

6.    For such other and further relief as this Court may deem just and equitable.


Dated:  October 29, 2024                    **ROBINS KAPLAN LLP**

                                            **/s/ Kathryn H. Bennett**

                                            Robert Bennett, #6713
                                            Andrew J. Noel, #322118
                                            Kathryn H. Bennett, #0392087
                                            Marc E. Betinsky, #0388414
                                            Greta A. Wiessner, #0401130
                                            Julie C. Moroney, #0504300
                                            800 LaSalle Avenue, Suite 2800
                                            Minneapolis, MN 55402
                                            Telephone:  612-349-8500
                                            rbennett@robinskaplan.com
                                            anoel@robinskaplan.com
                                            kbennett@robinskaplan.com
                                            mbetinsky@robinskaplan.com

95537616.1

gwiessner@robinskaplan.com
jmoroney@robinskaplan.com

***Attorneys for Plaintiff Deyonta Green***

95537616.1